In the Matter of **HUDSON & MANHATTAN RAILROAD COMPANY,**
Debtor.
**No. 90460.**

United States District Court
S. D. New York.
Dec. 21, 1955.

House, Grossman, Vorhaus & Hemley and Edward M. Garlock, New York City, for the Petitioning Creditors. Leonard Hemley, Edward M. Garlock, New York City, of counsel.

McGoldrick, Dannett, Horowitz, & Golub, New York City, for Herman T. Stichman, Trustee. William W. Golub, Myron S. Isaacs, Jerome Talbert, New York City, of counsel.

Harry T. Zucker, New York City, for the Stockholders.

Valente & Hallheimer, New York City, for the debtor. Otis M. Waters, Lawrence S. Timen, New York City, of counsel.

Louis Kipnis, New York City, for Jones Committee for Adjustment Income Bondholders.

Edward Endelman, New York City, for Kohn Committee for the Adjustment Income 5 per cent Bonds. Milton M. Unger, Newark, N. J., Daniel W. Blumenthal, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for Chemical Corn Exchange Bank. Frederick S. Beebe, Henry P. Riordan, New York City, of counsel.

Kelley, Drye, Newhall & Maginnes, New York City, for The Hanover Bank. Frank H. Heiss, Albert A. Eustis, New York City, of counsel. Frederick T. Finnigan, New York City, Solomon Freedman, Washington, D. C., for Securities and Exchange Commission.

WALSH, District Judge.

After a hearing on the issues raised by the answer of a stockholder, the approval of the creditors' petition for reorganization of the debtor is reaffirmed.

The debtor is an interurban electric railway running between New York, Jersey City, Hoboken and Newark. The petition for its reorganization under Chapter X of the Bankruptcy Act, 11 U. S.C.A. § 501 et seq. was filed on August 11, 1954 by three of its bondholders. On December 8, 1954, after unsuccessfully moving to dismiss it, the debtor filed an answer which denied any act of bankruptcy but admitted its inability to meet its debts as they matured, and which consented to and joined in the prayer for

reorganization.[1] On December 14, 1954, the petition for reorganization was approved.

On December 22, 1954, a stockholder, pursuant to section 137 of the Bankruptcy Act, filed an answer controverting the debtor's inability to meet its debts as they matured and also denying its alleged insolvency and acts of bankruptcy. A hearing has been held, limited to the issue of the debtor's inability to meet its debts as they mature, and the proof has established this allegation of the petition.

The first question is whether the pleadings presented any issue other than inability to meet debts as they mature. And the second is whether that inability was established by the proof.

## I

### The Issues Requiring Trial

The good faith of the petition, which the statute requires, was admitted by the debtor and subsequently was established at the hearing on the stockholder's answer. The answer of the debtor joining in the prayer for reorganization was free from collusion. In bitter litigation the debtor had tried to secure the dismissal of the petition (D.C.N.Y., 126 F.Supp. 359). It had also attempted to file its own voluntary petition for reorganization as a railroad under Section 77, 11 U.S.C.A. § 205.[2]

Under these circumstances, notwithstanding the debtor's denial of the alleged acts of bankruptcy, the petition for reorganization was approved without a hearing. Proof of acts of bankruptcy are not required when the debtor, itself, petitions for reorganization,[3] but only when the debtor controverts an involuntary petition.[4] Even though the debtor's prayer was expressed by answer rather than petition, it was believed to have the same effect so far as reducing the issues necessary to be tried. The debtor's answer admitted the allegations necessary for a *voluntary* petition.[5] Section 143 requires a hearing only if the debtor controverts a *material* allegation of the petition. Its denial of the acts of bankruptcy was regarded as immaterial in the light of its prayer for reorganization. Its answer was therefore regarded as noncontroversial.

This view is supported by In re Palisades-on-the-Desplaines, 7 Cir., 89 F.2d 214; In re Park Beach Hotel Bldg. Corp., 7 Cir., 96 F.2d 886 and Snyder v. Fenner, 3 Cir., 101 F.2d 736, all decided under Section 77B, the predecessor of Chapter X. It is not precluded by holdings in liquidation proceedings that a debtor's consent to reorganization by answer cannot transform an involuntary proceeding into a voluntary one, In re Condon, 2 Cir., 209 F. 800; Klein v. Nu-Way Shoe Co., 2 Cir., 136 F.2d 986, 989–990; In re Supreme Lodge of the Masons Annuity, D.C.N.D.Ga., 286 F. 180, 182; In re Elmsford Country Club, D.C.S.D. N.Y., 50 F.2d 238. The liquidation precedents are not applicable because in liquidation proceedings, unlike Chapter X proceedings, a debtor may file a voluntary petition even after an involuntary petition is filed. In these cases, there was therefore no need to permit the debtor to "transform" the nature of the original involuntary proceeding, with possible attendant confusion as to the exact meaning of the resulting judgment, or confusion as to the period prior to the petition as to which preferential payments might be set aside.[6] The debtor

---

1. After the expiration of its time to amend its answer as of right, the debtor, without leave, filed a purported amended answer on December 29, 1954. It would add a denial of insolvency to the denial of acts of bankruptcy.

2. References are to the Bankruptcy Act unless otherwise indicated.

3. § 130.

4. §§ 131, 142, 143.

5. § 130.

6. In liquidation, at the time In re Condon, supra, was decided, voluntary proceedings had significant differences from involuntary ones. Individual creditors had different rights. Also, certain types of corporations were expressly put beyond the reach of involuntary proceedings and

did not need this alternative; he could always commence a fresh voluntary proceeding upon his own petition. In reorganization proceedings, however, section 126 prevents the filing of subsequent petitions while a prior petition for reorganization is pending. Once the creditors have taken the initial step, the only way the debtor can eliminate the need for proving acts of bankruptcy without admitting them, is by the type of answer filed here.

Moore v. Linahan, 2 Cir., 117 F.2d 140, 142, does not compel a contrary conclusion. In that case a board of directors, knowing that it was about to be voted out of office, filed an answer to an involuntary petition, consenting to reorganization. When the new board attempted to withdraw the answer, the lower court held that the answer was to be treated as a petition even to the extent of preventing its withdrawal without notice to all creditors under section 59, sub. g, 11 U.S.C.A. § 95, sub. g. The Court of Appeals reversed, holding that section 59, sub. g did not apply to a debtor's answer even though it consented to and prayed for reorganization. It did not hold that an act of bankruptcy must be proved notwithstanding the debtor's desire for reorganization. Its reference to the liquidation cases above

cited and its comments upon the difference between Chapter X and Section 77B did not require such an interpretation.[7] It did not disapprove the holdings of In re Palisades-on-the Desplaines, In re Park Beach Hotel Bldg. Corp., and Snyder v. Fenner, supra; it merely declined to extend them to the extreme of treating a consenting answer as a voluntary petition in form as well as substance. The court's own language emphasized that it was not using a matter of form to defeat a substantial right but rather it was refusing to permit a substantial right to be defeated by a mis-asserted technical claim of form. It said (117 F. 2d at page 144):

"* * * Thus on that view of § 59, sub. g, [governing the right to withdraw a voluntary petition] our decision would turn upon a question of form rather than of substance, which is to be avoided when possible, though here it seems to us impossible to avoid it for the reasons we have given. Be that as it may, we need not too much regret it even if in this instance form may prevail, because, although directors, so long as they hold office and use an honest judgment, are immune from the control of their shareholders * * * the power to commit a corporation

In re Supreme Lodge of the Masons Annuity, supra, and In re Elmsford Country Club, supra, merely held that the debtor could not by its consent validate a petition which the court expressly had no authority to receive.

7. The liquidation cases are distinguishable as already shown.

The difference between Chapter X and former Section 77B referred to by the court is not significant here. Congress failed to include in Chapter X the provision of Section 77B which expressly permitted the debtor to use its answer to an involuntary petition for *liquidation* as a voluntary petition for *reorganization*. This was a mere procedural alternative to a voluntary petition for reorganization which the debtor has always been permitted to file after an involuntary *liquidation* proceeding has been started. Congress' only purpose in discarding this alternative, according to the

Committee Report (S.Rep.1916 on H.R. 8046, 75 Cong., 3 Sess. (1938), p. 25), was to eliminate something completely unnecessary. As long as the debtor had an effective procedure for seeking reorganization by voluntary *petition*, there was no need to give him the procedural alternative of seeking this relief by *answer*.

In the present case, however, the creditors' original petition is for *reorganization*. Thus, the need to permit a non-controversial answer to limit the issues to those of a voluntary proceeding, is apparent, because in such a case, section 126 prohibits the filing of any subsequent petition for reorganization, voluntary or involuntary. The *only* way the debtor can narrow the issues to be tried is by his answer. And section 142 expressly provides for the filing of a noncontroversial answer.

one day before they know they are to be displaced, to a course known to be disapproved by the majority is not one to be generously extended. * * * "

■ The petition was thus approved without a hearing. As between the petitioning creditors and the debtor this approval of the petition was a final determination.[8] The debtor did not appeal. Its time to appeal has expired. Proof of an act of bankruptcy not being a jurisdictional fact necessary to the power to hear the case,[9] but at most a fact necessary to the relief granted, the debtor's only remedy was by appeal. It could not attack this determination collaterally in the proceeding on the stockholder's answer. In re Park Beach Hotel Bldg. Corp., 7 Cir., 96 F.2d 886, 891; Gilbertson v. United States, 7 Cir., 168 F. 672, 674; Edelstein v. United States, 8 Cir., 149 F. 636, 638.[10]

After the approval of the petition and before the date set for hearing on the qualifications of the trustee who had been appointed, the stockholder, as permitted by section 137, filed an answer denying the debtor's inability to meet its debts as they matured. It also denied the debtor's insolvency and the commission of any act of bankruptcy. The stockholder, now joined by the debtor, claims that the denials of insolvency and

acts of bankruptcy framed material issues requiring a hearing.[11]

■ Having concluded that the petition of the creditors and answer of the debtor taken together left the proceeding with the same issues as though a voluntary petition had been filed, the stockholder's answer was appraised accordingly. The allegations of acts of bankruptcy having been rendered immaterial by the debtor's prayer for reorganization, the stockholder's denial of those allegations was likewise held to be immaterial. His answer was given the same effect as though it had been filed after a voluntary petition by the debtor.[12]

■ The stockholder had the right to put in issue those allegations of fact alleged by the petition which still remained material in the light of the debtor's own prayer for reorganization but he had no standing to compel the court to read the pleadings in disregard of the prayer of the debtor, any more than he could have compelled the court to disregard the voluntary quality of a petition which the debtor might have filed originally. An answer of a stockholder could not make involuntary, a proceeding which prior to its filing had, at least for the purpose at hand, acquired the characteristics of a voluntary one.

■ In Moore v. Linahan, supra, 117 F.2d 140, 143, Judge Learned Hand,

---

8. § 149.

9. Jurisdiction over the subject matter of a bankruptcy proceeding is acquired by the bankruptcy court when an involuntary petition is filed stating cause for adjudication within the act. It does not depend on proof of an act of bankruptcy. That an act of bankruptcy is not proven does not affect the court's power to determine the case, nor does it impair the validity and conclusiveness of its judgment. Sabin v. Larkin-Green Logging Co., D.C.Or., 218 F. 984, affirmed 9 Cir., 222 F. 814.

10. See also Swift & Co. v. United States, 276 U.S. 311, 327, 48 S.Ct. 311, 72 L.Ed. 587, in which a similar question was considered with respect to a consent decree.

11. Subsequently, after its time to appeal

had expired, the debtor sought to force a hearing on solvency and acts of bankruptcy and to be permitted to retain a firm of engineers at the expense of the estate to make studies for this purpose. When its application was denied it moved for leave to amend its answer in order to withdraw its consent to reorganization. This motion was denied because of the steps toward reorganization which had already intervened and because the allegations of fact in support of the motion were found to be false.

12. Consistent with this analysis, the stockholder was not required to submit preliminary proof of solvency as would otherwise be required if solvency were then in issue. A stockholder's right to submit an answer is restricted to cases in which the debtor is solvent. § 137.

without deciding the question, expressed doubt that an individual stockholder, or even an individual creditor, could challenge the allegation of an act of bankruptcy, regardless of the position taken by the debtor.[13] In addition to the reasons Judge Hand gave for limiting the literal language of the section as to both, there is an additional reason applicable to the stockholder alone. A stockholder, by the very terms of section 137, is permitted to file an answer only in cases where the debtor is *not* insolvent.[14] To understand the effect of this limitation, it is necessary to read it with section 130, which prescribes the essentials for a voluntary petition. These include inability to meet debts as they mature *or* insolvency. It was, I believe, the intent of Congress to restrict the stockholder's right to answer, to those cases where the debtor petitioned for reorganization upon the basis of inability to meet debts as they mature, but not to authorize it where the petition was on the basis of insolvency. In any event, Congress could not have contemplated that the stockholder would be litigating acts of bankruptcy based, as here, upon payments during a period of insolvency. The stockholder had no standing to litigate the issue of solvency except upon a preliminary hearing to establish his right to submit an answer, a hearing unnecessary here because his answer was accepted upon the premise that solvency was not, at that stage, in dispute.

## II
### Proof of Inability to Meet Debts as They Mature

On the hearing, the proof of inability to meet debts as they mature was established in two principal respects: (1) It is undisputed that the debtor had no possibility of avoiding default on its bonds when they fell due on February 1, 1957;

(2) On the date of the petition it was paying its current obligations only by a process of liquidation inconsistent with its continuation as a going business, by failing to replace hazardous equipment, and by failing to meet the obligation of its bond indentures to replace worn-out rolling stock or accumulate funds for that purpose.

It has been previously held that inability to meet debts as they mature is not limited to debts which have already matured. In re Kelly Springfield Tire Co., D.C.Md., 10 F.Supp. 414; Matter of American-LaFrance & Foamite Corp., D.C.S.D.N.Y., Civ. 609–43 (Report of Special Master Harold R. Medina). If the maturity of the debt is imminent and the inability to meet it certain, the debtor is unable to meet debts as they mature, within the meaning of the statute. The question is whether two and one-half years is too far into the future to look. No authority suggests a fixed limit in this regard. It would seem to depend upon the inescapable quality of the obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough. First National Bank of Cincinnati v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465.

Here certainty seems established as convincingly as it can be in human affairs. The amount of the obligation to be met was huge, $46,339,404.62. It could not be avoided. No fund existed for its redemption. Efforts to refinance through negotiation with present bondholders had been abandoned as fruitless. Interest rates on any new borrowing would have been prohibitive, assuming that anyone would have loaned the debtor the full amount of its bonds. Other plans, such as the sale of the debtor's most profitable asset, its terminal building, and also the sale of its uptown Manhattan branch, had all been abandoned as

13. Cf. 6 Collier, Bankruptcy, 14th Ed., 1631.

14. Section 137 reads: "Prior to the first date set for the hearing provided in section 161 of this Act, an answer controverting the allegations of a petition by or against a debtor may be filed by any creditor or indenture trustee or, *if the debtor is not insolvent,* by any stockholder of the debtor." (Emphasis supplied.)

impracticable. The debtor's prospects were not improving but on the contrary were getting worse. It had consistently failed to earn its expenses and interest for several years.[15]

Under these circumstances, to insist on further liquidation to a point of actual default would be to ignore the purpose of Chapter X, which contemplates court intervention while there is still some hope of survival through readjustment of fixed obligations. Fidelity Assur. Ass'n v. Sims, 318 U.S. 608, 617–618, 63 S.Ct. 807, 87 L.Ed. 1032; Oglesby & Simpson Supply Co. v. Duggan, 8 Cir., 174 F.2d 904, 906; In re Ware Metal Products, D.C.Mass., 42 F.Supp. 538, 541. First National Bank of Cincinnati v. Flershem, supra, relied upon by the stockholder is distinguishable. There, default was not really imminent. Management sought merely to improve the position of the corporation by artificially creating a default—deliberately withholding interest payments although it could have made them. The principal of the obligations were not due for sixteen years.

In addition to the certainty of default upon the principal of its bonds, the debtor's inability to meet its debts as they matured was manifest in the excess of its current liabilities over current assets available for the payment of the debts, and also the certainty that it must replace outworn cars, a liability just as real as those stated on its balance sheet.

On the date of the petition, August 11, 1954, the debtor's current assets were $2,084,599.78, its current liabilities were $1,348,385.52.[16] However, not all of its current assets were available for the payment of debts if it was to continue its operations. In fact, only $887,842.97 could be considered available for this purpose. The current assets of the debtor which were not available for payment of current liabilities include:

(1) $200,000 required to be maintained as balances in its active bank accounts.

(2) $5,000 necessary to be maintained in the Treasurer's petty cash fund to meet miscellaneous needs.

(3) $13,755.46 deposits of tenants held as trust funds. (These are offset under "deferred liabilities" rather than "current liabilities").

(4) $75,000 necessarily held by ticket agents for the purpose of making change.

(5) $903,001.35 materials and supplies. This was the minimum required to be kept on hand.

The deficit of current liabilities over current assets available to pay debts was $460,542.55.

The debtor's immediate plans for a minimum program to maintain its prop-

---

15. (Amounts stated to the nearest thousand dollars; 000 omitted)

|  | 1950 | 1951 | 1952 | 1953 | 1/1/54–8/11/54 |
|---|---|---|---|---|---|
| Net railway operating income or (loss) | $ 220 | ($ 272) | $ 288 | ($ 175) | ($ 226) |
| Net real estate operating income | $ 801 | $ 901 | $1,066 | $1,138 | $ 659 |
| Net income available for bond interest | $1,000 | $ 589 | $1,320 | $ 904 | $ 425 |
| Interest on First Mortgage and Refunding Mortgage bonds | 1,472 | 1,472 | 1,472 | 1,472 | 902 |
| Net (loss) before Income Mortgage bond interest | ($ 472) | ($ 882) | ($ 151) | ($ 568) | ($ 477) |

16. The amount shown in Exhibit 135 is reduced by $94,917.74, the amount of deferred interest on the adjustment income bonds.

erty and permit its safe operation included the following authorized expenditures which on the date of the petition had not yet been represented on the balance sheet as liabilities:

(1) For real estate projects ................$ 58,138.00
(2) For completion of authorized railroad projects ................ 263,957.00
(3) For other railroad projects begun ...... 36,200.00

$358.295.00

Added to the deficit of current liabilities over current assets the combined deficit was $818,837.55.

The stockholder contends that the debtor's insurance fund consisting of cash and marketable securities totaling $673,-774.00 should be considered as available to meet debts. On the date of the petition, the debtor was a self-insurer as to all public liability claims up to $100,000 and over $2,100,000. It was also a self-insurer as to its own personnel. Under these conditions, it was certainly necessary that it keep a fund to meet its potential liability and there was no basis for concluding that the amount of this fund was excessive. Accordingly, it may not be regarded as available to meet debts.[17] Even if the contentions of the stockholders were accepted, however, the current liabilities would still exceed available funds by $145,063.35.

The debtor's urgent need to replace its rolling stock was actually the most serious of its true liabilities. Under the Interstate Commerce Act, it was required to render service which was safe and adequate.[18] All of its cars were old, its most recent acquisitions being 20 cars which were acquired in 1928. On December 31, 1954, the date of the last analysis prior to the petition, over half of its then active fleet of 273 cars had been acquired between 1909 and 1911. Its cars were divided into 39 red cars designed and used for the Newark service, and 234 black cars, which were used in its underground service between New York, Jersey City and Hoboken. The black cars are not usable in the Newark service. These black cars have not had the regular class repairs required by sound railroad practice and now require excessive maintenance. The red cars, however, because of certain weaknesses in design and their exposure to out-of-door service over the years, were actually hazardous to operate. Corrosion had so eaten away their end-posts that each of them had had to be reinforced to hold it to the car frame. Metal fatigue was believed to exist to a serious degree but there was no way short of actually stripping the cars to know how bad it was. Shortly after the filing of the petition one car carrying passengers shifted from its trucks while coming into a station. An analysis of its center casting showed the accident due to metal fatigue. These cars were not capable of withstanding collisions without jeopardy to their passengers. They were beyond repair. Their need for immediate replacement was not subject to doubt.

The older black cars, although not subject to the same hazards as the red cars, should have been replaced as a matter of economy, but their continued operation did not conflict with the debtor's obligation for safe and adequate service.

A rough estimate of a minimum car program then required by the debtor is as follows:

(1) Replacement of the 31 red cars acquired in 1911 at an estimated cost of $80,000 a car—$2,480,000.
(2) Commencement of a program to replace the old black cars and class repair the newer cars. Its ultimate cost would run somewhere from $7,500,000 if all of these cars were class repaired to $12,790,000 if the 128 cars acquired before 1911 were replaced and

17. This fund was accumulated by deductions from income at a time when the income bondholders were not receiving interest. They have filed a claim that any excess in this fund is held in trust for them.

18. 49 U.S.C.A. § 1(4).

the others class repaired. Because the record does not establish the time within which this repair or replacement was required to be accomplished, it has not been taken into account beyond the plans to repair 18 additional cars, which had actually been authorized before the petition was filed and which is included in the $263,957.-00 for authorized railroad projects already mentioned.

Each of the three mortgage indentures of the debtor provided in substance that it would keep its rolling stock in good repair and replace it when worn out.[19] They applied to after-acquired rolling stock as well as that which the debtor had when the indentures were executed. In addition, the indentures of the first lien and refunding mortgage and the adjustment income mortgage also required that the debtor set apart from its earnings an amount necessary for this purpose.[20] A property amortization fund was duly established by the debtor in accordance with these provisions. Regular deposits were made to it each year until 1951. Between 1921 and 1935 slightly over $2,000,000 was withdrawn from this fund for the improvement of the debtor's property. Between 1930 and 1950, however, the greater part of this fund was used to purchase and retire the debtor's own bonds, including $4,633,907.00 of its junior bonds. Finally, in 1949, 1950 and 1951, the entire cash balance of the fund, $5,791,967.00, was withdrawn to meet current expenses.

The evidence thus establishes that the debtor had avoided actual default in its contractual obligations only by failing to replace its worn-out cars and because the trustees of the various indentures had not elected to declare a default. Under these circumstances, it was certain that the debtor would default upon the principal of its bonds on February 1, 1957, and it is almost certain that a default in interest payments or other current obligations would occur before that time.

Accordingly, it is my conclusion that at the time the petition was filed the debtor was unable to meet its debts as they matured and that the previous approval of the petition for reorganization should be reaffirmed.

It is so ordered.

---

19. First Mortgage, Article 4, Section 5; First Lien and Refunding Mortgage, Article 4, Section 10; and Adjustment Income Mortgage, Article 4, Section 8.

20. First Lien and Refunding Mortgage (February 1, 1913), Article 4, Section 10; Adjustment Income Mortgage (February 1, 1913), Article 4, Section 9.