**In re CITY OF BRIDGEPORT, Debtor.**

**Bankruptcy No. 91–51519.**

United States Bankruptcy Court,
D. Connecticut.

Aug. 1, 1991.

---

$$\frac{2,203,000.00}{(1.025)^{56}} = \frac{2,203,000.00}{3.986} = 552,684.40$$

The present value of the lump sum payment under the Modification is $677,370.80:

$$\frac{2,700,000.00}{3.986} = 677,370.80$$

Barbara Brazzel–Massaro, City Atty., Richard D. Zeisler, James Berman, Robert M. Zeisler, Barbara L. Hankin, Roy W. Moss, Zeisler & Zeisler, P.C., Bridgeport, Conn., for City of Bridgeport.

Richard Blumenthal, Atty. Gen., Richard T. Couture, Joan E. Pilver, Asst. Atty. Gen., David G. Hetzel, Elliot N. Solomon, Hebb & Gitlin, Hartford, Conn., for State of Conn.

## MEMORANDUM AND SECOND ORDER ON THE OBJECTION OF THE STATE OF CONNECTICUT TO CHAPTER 9 PETITION

ALAN H.W. SHIFF, Bankruptcy Judge.

### BACKGROUND

On June 6, 1991, the City of Bridgeport, Connecticut, filed a petition under chapter 9 of the Bankruptcy Code. On June 12, the State of Connecticut and the Bridgeport Financial Review Board[1] (together "the State") filed an objection to the petition, *see* 11 U.S.C. § 921(c),[2] asserting, *inter alia*,[3] that Bridgeport was not insolvent when it filed its petition and that the petition was filed in bad faith.[4] On June 21, the State

---

**1.** The Bridgeport Financial Review Board was established by the State in June, 1988, pursuant to Special Act No. 88–80, "to review the financial affairs of the town and city of Bridgeport, all in order to maintain access to public credit markets, to fund the city's accumulated deficits and to restore financial stability to the town and city of Bridgeport." Special Act No. 88–80, § 1. *See In re City of Bridgeport*, 128 B.R. 688 (Bankr.D.Conn.1991, B.J.), at 699–703, for a more detailed discussion of the powers and duties of the FRB.

**2.** Bankruptcy Code § 921(c) provides:

After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

**3.** The State also objected on the ground that Bridgeport was not generally authorized to be a

debtor under chapter 9 by state law. That objection was the subject of a June 26 hearing and was overruled in a July 22 Memorandum and Order, familiarity with which is assumed.

**4.** Code § 109(c) provides:

An entity may be a debtor under chapter 9 of this title if and only if such entity—

(1) is a municipality;

(2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

filed an amended objection, asserting that the mayor of Bridgeport was not properly authorized to file the petition by the Bridgeport Common Council.

## DISCUSSION

### 1.

### Burden of Proof

■ Bridgeport argues that the State has the burden of proof because it seeks dismissal of this case. The State responds that this court should follow the line of decisions under other chapters of the Code which hold that the burden of proving that an entity is eligible to be a debtor is on the party that files the petition.

Bankruptcy Rule 1001 provides in part:
The Bankruptcy Rules and Forms govern procedure in cases under title 11 of the United States Code.

Bankruptcy Rule 9009 provides in part:
The Official Forms prescribed by the Judicial Conference of the United States shall be observed and used with alterations as may be appropriate.

Official Form 1, entitled "Voluntary Petition", requires an affirmation that
[p]etitioner is qualified to file this petition and is entitled to the benefits of title 11, United States Code as a voluntary debtor.

Code § 301 states that "[a] voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter." Section 109 specifies who may be a debtor. It follows then that an entity which files a voluntary petition implicitly asserts that it meets the relevant requirements under § 109.

■ The general rule is that the burden of proof is imposed upon the party who asserts the affirmative of an issue, *Lodge 743, Int'l Ass'n of Mach., AFL–CIO v.*

*United Aircraft Corp.,* 299 F.Supp. 877, 890 (D.Conn.1969), *modified on other grounds,* 534 F.2d 422 (2d Cir.1975), and many courts have held that the burden of proving eligibility under § 109 is on the party filing the petition. *E.g., Tim Wargo & Sons, Inc. v. Equitable Life Assurance Soc. of the U.S. (In re Tim Wargo & Sons, Inc.),* 869 F.2d 1128, 1130 (8th Cir.1989); *Matter of Morgan Strawberry Farm,* 98 B.R. 584, 585 (Bankr.M.D.Fla.1989). As required, Bridgeport's petition includes an allegation that it is qualified to file and that it is entitled to the benefits of title 11. Accordingly, I conclude that Bridgeport has the burden of proving that it was insolvent when it filed its petition; that its petition was filed in good faith; and that the mayor was properly authorized to file the petition.

### 2.

### Was Bridgeport Insolvent?

■ Code § 109(c)(3) provides that a municipality may be a chapter 9 debtor "if and only if ... [it] is insolvent". *See supra* note 4. Section 101(32) provides:

"insolvent" means—

. . . .

(C) with reference to a municipality, financial condition such that the municipality is—

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or

(ii) unable to pay its debts as they become due. . . .

It is undisputed that on June 6 Bridgeport was paying its debts as they became due. The issue here is whether Bridgeport was "unable to pay debts as they become due."

Connecticut has delegated home rule authority to its cities to provide for the health, safety, and general welfare of their

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or
(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

residents.[5] It is commonly recognized that Bridgeport, like many cities in the northeast and other areas of the country, is financially distressed and has been for many years. The Chief of Police, Thomas J. Sweeney, testified that as of July 1, 1991, there were 341 police officers in Bridgeport, twenty-two less than the previous low point in the last forty years; that in 1990, his department received approximately 100,000 calls for service requiring the assistance of an officer; that 430 police officers are necessary to provide basic, adequate service; that there are neighborhoods in Bridgeport which have been surrendered to drug dealers and in which people are reluctant to leave their homes; that there were fifty-eight murders in Bridgeport in 1990; that his staff of twenty-three detectives, approximately half of what is needed, is so overworked that there is almost no investigation of property crime; that although Bridgeport has the second highest rate of automobile theft in the United States, only one detective investigates those crimes; and that response to emergency or so-called "hot" calls is often delayed because there is no available police officer. *Tr. July 17*, at 106–18.

The Director of Public Works, Michael Hudzik, testified that budgetary constraints required him to sharply reduce residential garbage collection which contributes to illegal dumping that cannot be collected, the effect of which creates a rodent and arson hazard; that snow plowing this winter will be minimal; that there is only one street sweeper to clean the approximately 275 miles of city streets; that there are eighteen custodians to clean 125 City-owned buildings; and that there are only two electricians to service all of the buildings and traffic lights. *Tr. July 17*, at 67–69.

Both Sweeney and Hudzik testified that cuts in their budgets below what is proposed in the 1991–1992 budget would put Bridgeport in a health and public safety emergency. *Tr. July 17*, at 106–18. *See also Bridgeport Exhibits C and D.* Bridgeport has recently closed two of its four senior citizen centers; eliminated all recreation programs and maintenance for fourteen of the City's sixteen parks; and reduced the library budget by 60%, so that branch libraries are only open one day and the main branch is only open twenty hours per week. *Tr. July 16*, at 28–29.

Bridgeport's 1991–1992 budget projects a deficit of approximately $16,000,000.00. *Bridgeport Exhibit R.* Bridgeport residents pay the highest effective taxes in the state, *Bridgeport Exhibit TTT, App. 15*, and it has been argued that anything more than a modest tax increase would be counterproductive. *Tr. July 18*, at 147–49, 292–93.

Although the State has challenged many of Bridgeport's specific claims, it is clear that state officials are concerned about its plight. The remedy for, not the fact of, Bridgeport's problems had been debated at the state and local level long before the petition was filed. Indeed, officials at the state and local level have continued to meet during the pendency of this case. *Tr. July 22*, at 37–41.

■ In order to meet its obligations, each city establishes a budget each fiscal year which anticipates the expenditures for those mandated services and the revenue necessary to fund them. The budget process is an annual battle fought at the national, state, and local levels of government. The State's expert witness, Philip Dearborn, who has had extensive experience in municipal finance and government, testified that

> [t]he process of budgeting is always a difficult one. All budgets start out initially out of balance.... [T]he demands for spending always exceed the resources that are available, and this leads to ... a conflict ... throughout the budget process, and it leads to very difficult times in balancing budgets....

*Tr. July 19*, at 163. The perennial question during that process is what should be the proper level, priority, and cost of governmental operations, and what should be a reasonable level of taxation, state aid, and

---

5. *See* Conn.Gen.Stat. §§ 7–148(c), 7–194.

other funds. The answer in the first instance must come from the political process, not the courts. If, however, a city is insolvent under § 109(c)(3), and if it is otherwise eligible to be a debtor, chapter 9 may be used. Chapter 9 offers a solution to chronic economic distress caused by costs and revenues spiraling in opposite directions, but Chapter 9 is not available to a city simply because it is financially distressed. Thus, the issue is not whether Bridgeport was in financial trouble, but rather whether it was insolvent when it filed.

### retrospective or prospective analysis

■ The State argues that "[i]t stands to reason that, since the city has been ... paying all of its debts, it is also 'able' to pay those debts." *Brief of State* at 13. It is further argued that "both clauses of § 101(32)(C) were written in the present tense to comprehensively cover a city's *current* failure or unwillingness or inability to pay its debts in a fiscal crisis." [6] *Pre–Trial Memorandum of State* at 13 (emphasis added). The State therefore rejects an insolvency standard based on "a projected future inability to pay" as an unwarranted repudiation of the express language of § 101(32)(C). *Pre–Trial Memorandum of State* at 15. Bridgeport responds that § 101(32)(C)(ii) requires a prospective analysis. I agree with Bridgeport. *See Caruso Enter., Inc. v. U.S.A. Motel Corp. (In re U.S.A. Motel Corp.)*, 450 F.2d 499, 503 (9th Cir.1971) ("[T]he statutory requirement of inability to meet debts as they mature is not limited to debts which have already matured."); *Matter of Hudson & Manhattan R.R. Co.*, 138 F.Supp. 195, 200 (S.D.N.Y.1955).[7]

If § 101(32)(C) were read as the State suggests, the second clause of that subsection would be a subcategory of the first, *i.e.*, clause (ii) would merely provide an

explicit reason why, under clause (i), a city was not paying its debts as they became due. However, it is clear from the construction of (32)(C) that clause (ii) is separate from, not a part of, clause (i). The two parts of § 101(32)(C) are joined by the disjunctive "or". Code § 102(5) provides that "'or' is not exclusive...." The legislative history of § 102(5) states that "if a party 'may do (a) or (b)', then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives." S.Rep. No. 989, 95th Cong., 2d Sess. 28 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5814. *See also In re Broad Assoc. Lim. Partnership*, 125 B.R. 707, 711 (Bankr.D.Conn.1991).

Moreover, the State's interpretation would render the second clause mere surplusage, but that result would be contrary to this court's obligation "to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). If "unable to pay" means, as the State argues, not paying, i.e., *current nonpayment*, because of inability to pay, Congress could have omitted (ii) without changing the meaning of the statute.

The conclusion that § 101(32)(C)(ii) requires a prospective analysis also comports with the purpose of chapter 9. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979) ("As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve."). Cities cannot go out of business. Chapter 9 is intended to enable a financially distressed city to "continue to provide its residents with essential services such as police protection, fire protection, sewage and garbage removal, and schools ...," H.R.Rep.

---

6. *See supra* at 335 for text of § 101(32)(C).

7. Bankruptcy Act § 130 enumerated specific matters that had to be incorporated in a chapter X petition. Subsection (1) required that the petition state that "the corporation is ... unable to pay its debts as they mature...." That phrase is essentially the same as the definition

of municipal insolvency provided in Code § 101(32)(C)(ii), so that decisions construing that language in the Act are useful guides for the interpretation of the comparable language in the Code. *See Rosenbaum v. Kilson (Matter of Kilson)*, 83 B.R. 198, 201 (Bankr.D.Conn. 1988).

No. 1011, 100th Cong., 2d Sess. 2 (1988), U.S.Code Cong. & Admin.News 1988, pp. 4115, 4116, while it works out a plan to adjust its debts and obligations. A construction of § 101(32)(C) under which a city would not be able to seek chapter 9 protection unless and until it was actually not paying its bills could defeat that purpose, as actually not paying bills could lead to the non-delivery of services.

The State is correct that the reference point for the insolvency analysis is the petition date. *See* H.R.Rep. No. 1011, 100th Cong., 2d Sess. 5–6 (1988). That is, it must be determined as of that date whether Bridgeport *will be* unable to pay its debts as they become due.

### budget gap or cash flow analysis

■ Bridgeport offered evidence to prove that it will have a $16,000,000.00 budget deficit in fiscal year 1991–1992. The City argues that since its expenditures will exceed its revenue, it has satisfied the burden of proving that it is insolvent. The State counters that if a prospective analysis is used, Bridgeport's solvency should be judged by a cash flow, not a budget deficiency, analysis. I agree with the State. Section 101(32)(C)(ii) defines insolvency by whether Bridgeport will be able to "pay its debts as they become due", not on whether it has a budget gap.

The State further argues that Bridgeport has sufficient cash to make up any shortfall in its 1991–1992 fiscal year budget. Again, I agree with the State, as it is uncontested that Bridgeport will not run out of cash this fiscal year (1991–1992). *Tr. July 17*, at 285–86; *Tr. July 19*, at 162.

On July 1, 1991, the first day of the 1991–1992 fiscal year, Bridgeport had $27,908,513.00 in cash. *Bridgeport Exhibit S*. The bulk of that money was raised as part of a $58,315,000.00 bond sale in January 1989. Approximately $35,000,000.00 of the bond sale proceeds were used to eliminate an accumulated deficit. The remainder, according to Francisco Borges, the State Treasurer and former chairman of the Financial Review Board, was intended to be and has been used to pay operating costs as they become due. *Tr. July 19*, at 39. As Borges put it, the surplus money was intended to be a contingency fund to give Bridgeport "a cushion to allow it to be able to meet its obligations when due, [without] having to do the variety of short term borrowings the City had traditionally done, all at a very high interest rate." *Id.* at 40.

Bridgeport intends to use the $27,908,513.00 to fund its fiscal year 1991–1992 operating deficits. *Tr. July 17*, at 275. The City's cash flow analysis, which I find persuasive, *Tr. July 19*, at 162, projects that by using those funds, it will have a positive cash balance in every month of the 1991–1992 fiscal year and $12,547,699.00 on June 30, 1992, the last day of that year. *Bridgeport Exhibit S*.

While any money used this fiscal year ultimately must be accounted for, contrary to Bridgeport's argument, it does not have to be replenished this fiscal year. *Tr. July 17*, at 276; *Tr. July 18*, at 109–10; *Tr. July 19*, at 40. In November, 1992, a completed audit will disclose the exact amount, if any, of Bridgeport's fiscal year 1991–1992 budget deficit. If in fact there is a budget gap, Bridgeport will be obligated to reimburse the contingency funds used to balance the budget, but it may do so in fiscal year 1992–1993 or fiscal year 1993–1994. *Tr. July 19*, at 40, 42–43. It is therefore apparent that Bridgeport will be able to pay its debts as they become due during this 1991–1992 fiscal year.

### duration of cash flow analysis

■ Bridgeport argues that even if a cash flow analysis is the proper test, it is unrefuted that it will run out of cash early next fiscal year. I disagree.

Although the beginning point of the analysis is the date the petition was filed, neither § 101(32)(C)(ii) nor its legislative history provide guidance on how far into the future it should go. Under § 130 of the Bankruptcy Act, *see supra* note 7, a chapter X debtor was required to prove that its inability to meet its debts in the future was "imminent and certain, not merely a possibility or speculation." *In re U.S.A. Motel Corp., supra*, 450 F.2d at

503. *See also Matter of Hudson & Manhattan R.R. Co., supra*, 138 F.Supp. at 200 ("If the maturity of the debt is imminent and the inability to meet it certain, the debtor is unable to meet debts as they mature, within the meaning of the statute.").

Moreover, courts construe statutes in a way that accounts for the practical consequences of potential interpretations. *See New York Comm'n on Cable T.V. v. Fed. Communications Comm'n*, 571 F.2d 95, 98 (2d Cir.1978), *cert. denied*, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978); *Alabama ex rel. Graddick v. Tennessee Valley Auth.*, 636 F.2d 1061, 1066 (5th Cir. 1981), *cert. denied*, 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981). Just as a proposed budget is an informed projection of future revenue and expense, an analysis of future cash flow is a projection of the availability of expected cash to meet expected expense. Obviously it is necessary for cities to make informed financial projections. It is just as obvious that the longer the projection, the less informed the conclusion.

A prediction at the commencement of this case that Bridgeport will be unable to pay its debts as they become due in the 1992–1993 fiscal year is unreliable. There are many reasons, not the least of which is the uncertainty of its cash position during a fiscal year for which there is not even a proposed budget. As Dearborn testified, "projections beyond ... two years, even the second year, but beyond two years, are totally unreliable, they never work out as the projections show, they virtually never even come close because of the fact that you simply can't know all the changes that are going to take place." *Tr. July 19*, at 166. There are many variables which may effect Bridgeport's fiscal condition in the 1992–1993 fiscal year: the health of the regional, state, and national economies; the level of state and federal aid to Bridgeport; potential concessions by labor unions; potential voluntary suspension of tax abatements; potential savings through efficiency; increased tax collection rates; and the success of any efforts to borrow funds to offset any budget gap.

I conclude that to be found insolvent a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year. Bridgeport has not met that burden of proof.

It is worthy of note that even if a longer look at Bridgeport's cash flow were warranted, Bridgeport has not presented persuasive evidence that it will be unable to pay its debts at any time in the future, notwithstanding its assertion that it is unrefuted that it will run out of cash early in the 1992–1993 fiscal year. Bridgeport relies on the testimony of its finance director, Richard Robinson, that "depending upon how this year's audit comes and next year's, it's my opinion that it is ... very possible the City will run out of cash sometime during ... July, August, or September." *Tr. July 18*, at 87. In contrast, Dearborn testified "that going into [fiscal year 1992–1993], and my guess would be through 1993, that there should be [a] continued ... favorable cash position." *Tr. July 19*, at 162. Further, Bridgeport's claim that it will run out of cash in July, August, or September of 1992 is contradicted by its cash flow projections for the 1991–1992 fiscal year. Bridgeport projects that it will collect approximately $65 million in property taxes in July and August of 1991, increasing its cash position from $27,908,513.00 on July 1 to $44,633,773.00 on August 31. On September 30, its cash position is projected to be $32,629,972.00. *Bridgeport Exhibit S.* Thus, Bridgeport's available cash is at its highest during July, August, and September. There is no reason to believe, and none has been given by Bridgeport, why a similar pattern will not occur in fiscal year 1992–1993. *See Testimony of Philip Dearborn*, Tr. July 19, at 170–71.

## CONCLUSION

The budget process which generates conflict and debate every year over the appropriate amount and source of revenue and expenditures is at the core of our democracy. Each year mayors confer, negotiate,

and debate with department heads; legislative bodies; special interest groups, including employee unions; and state and national officials and legislators. The process, described by Dearborn as "very difficult, ... in which you have to work ... between the pressure groups," *Tr. July 19*, at 172, may take months before a city budget is adopted. The final product is the result of a compromise forged by the representatives of many constituencies.

Bridgeport claims that it is caught in an economic bind caused, on the one hand, by unaffordable employee union contracts and inadequate state aid and, on the other, by the practical reality that it can neither cut essential services nor raise taxes to pay for them. The City argues that sustaining the State's objection is tantamount to the conclusion that Bridgeport is not entitled to bankruptcy relief because its financial condition is too good. On the surface that argument has appeal. Bridgeport has demonstrated that its ability to provide even minimal services to its residents is strained, *see supra* at 334–335, and that its financial condition might get worse if drastic steps are not taken soon. The flaw in Bridgeport's argument is that financial difficulties short of insolvency are not a basis for chapter 9 relief. If such conditions are to be a criteria for municipal bankruptcy Congress, not the courts, will have to make that change in § 109(c). The fact is that Bridgeport was not insolvent when it filed, and therefore has no choice but to continue with the budget and collective bargaining processes.

I agree with Bridgeport that a city should not have to wait until it runs out of money in order to qualify for bankruptcy protection. It must, however, demonstrate, as a condition precedent to filing, that in the near future it will run out of money and be unable to pay its debts as they become due. In the absence of that proof, it would be an unwarranted intrusion into the political and collective bargaining processes for a bankruptcy court to become involved in the resolution of that

city's economic problems. If Bridgeport can meet that burden of proof and it otherwise qualifies under § 109(c), the protection and relief provided by chapter 9 will be available.

Thus, while Bridgeport was undoubtedly in deep financial trouble when it filed its petition, it was not insolvent, and that, in the context of this proceeding, is the congressionally approved criteria for bankruptcy intervention. Accordingly, the State's objection to Bridgeport's petition on the ground that Bridgeport was not insolvent when it filed its petition is SUSTAINED, Bridgeport's petition is DISMISSED, and IT IS SO ORDERED.[8]

---

8. As the State's objection is sustained on the ground that Bridgeport has not proven that it is insolvent, I need not reach the State's third and fourth objections.