**IN RE: RAVENNA METROPOLITAN DISTRICT, Debtor.**

**Bankruptcy Case No. 14–14207 EEB**

United States Bankruptcy Court,
D. Colorado.

Signed December 15, 2014

Patricia C. Campbell, Kathryn Hopping, Darrell G. Waas, Denver, CO, for United Water & Sanitation District.

Lars H. Fuller, Denver, CO, for Dianne Miller.

Gregory L. Williams, Block Markus & Williams LLC, James T. Markus, Jennifer M. Salisbury, Denver, CO, for Colorado Bondshares.

Daniel J. Morse, Cheyenne, WY, for US Trustee.

Harvey Sender, David Wadsworth, Denver, CO, for Ravenna Metropolitan District.

Chapter 9

## ORDER OF DISMISSAL

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER comes before the Court following a trial and subsequent briefing on the chapter 9 petition, filed by the Debtor Ravenna Metropolitan District (**"District"**) and the objections to eligibility filed by Colorado BondShares (**"CBS"**) and United Water and Sanitation District (**"United"**). Having considered the evidence and arguments raised, the Court hereby FINDS and CONCLUDES:

### I. BACKGROUND

Ravenna is an upscale real estate development located in the southwest Denver metropolitan area. It consists of 243 home sites, an 18–hole golf course, and 324.2 acres of open space. Currently, there are 30 completed homes in Ravenna. An entity called River Canyon Real Estate Investments, LLC (**"River Canyon"**) developed Ravenna beginning in 2002. As part of its development efforts, River Canyon organized the District in 2004 under the Colorado Special District Act, Colo.Rev.Stat. § 32–1–101 et seq., to provide public infrastructure and services, including sanitation, water, parks and recreation, street improvements, and snow removal. As is often the case with real estate developments, there was a substantial overlap between the principals of the developer, River Canyon, and the board of directors for the District. River Canyon's manager and principal, Mr. Glenn Jacks, served on the District's Board from its inception through late 2013, and still serves on the Board's chapter 9 litigation committee. As a result, River Canyon and its principals con-

tinue to play an important role in how the District and its finances are structured.

## A. The Bonds

As a special district, the District has the power issue bond debt and to levy property taxes on property owners within the District. The District's initial service plan limited its taxing authority to an annual ad valorem mill levy (a mill being equal to 1/10 of 1?) not to exceed 60 mills. Subsequently, in November 2007, the District's voters approved raising the mill levy limit to 63 mills. In the same general timeframe, the District passed a resolution (**"Bond Resolution"**) authorizing the issuance of $9,000,000 in bonds known as the General Obligation Limited Tax Bonds Series 2007 and $4,280,000 in Supplemental "B" Interest Registered Coupons (collectively, **the "Bonds"**). After deducting the costs of issuance and capitalized interest, the District received total proceeds from the Bonds of approximately $10,000,000. The Bonds were primarily issued to reimburse River Canyon for various infrastructure costs, including certain public water, sewer, street, and park and recreation improvements. All of the Bonds are currently owned by CBS.

The amount owed to CBS under the Bonds is the District's largest debt. The parties dispute, however, whether that debt is currently due and owing. The District's obligations are set forth in the Bond Resolution. Pursuant to that document, the District pledged the revenues from its "Required Mill Levy" for the payment of the Bonds. The **"Required Mill Levy"** is defined as an annual ad valorem mill levy imposed on all taxable property within the District in an amount sufficient to pay the principal and interest on the Bonds but not to exceed 60 mills. By pledging the revenues from its mill levy, the Bonds are secured pursuant to a statutory lien that arises under Colo.Rev.Stat. § 11–57–208.

## B. The Lease

In order to bring water to the Ravenna development, it was necessary to construct a water system, which involved among other things piping water from Plum Creek, nine miles from the development, acquiring the water carriage rights to do so, constructing a water treatment plant within the development, and a 600,000 underground water storage tank. To accomplish this, the District worked in conjunction with United, another, larger and more experienced special district. United established an "enterprise" (the legal significance of which will be discussed in detail in § II.A.1.(b) below) to finance and own a majority of the water system that would serve the District (sometimes interchangeably referred to as **"United or the United Enterprise"**). The agreement between the District and the United Enterprise was first set forth in a 2006 contract called the First Amended and Restated Water Service Agreement (the **"Water Service Agreement"**). Under this Agreement, the District purchased from United the right to withdraw 424 acre feet per year of nontributary water from three aquifers underlying the Denver metropolitan area.

The Water Service Agreement also divided up responsibility and ownership of the facilities that would be used to deliver the water. United agreed to build and would own a majority of the system, including: (a) headgate facilities on Plum Creek outside of the District; (b) raw water transmission lines to transport water to the District; (c) storage capacity in a reservoir constructed by United outside of the District; (d) a water treatment facility located in the District; and (e) a portion of the approximately 600,000 gallon underground water storage tank located within

the District. The District agreed to fund and would own all water transmission lines interior to the District from the point of the meters leaving the water treatment facility, and a portion of the underground water storage tank. The Water Service Agreement contemplated that the cost of the facilities built by United would be approximately $7 million, and would be funded, in part, through imposition of a water tap fee and a water resource fee on District landowners. The Water Service Agreement also required the District to pay United the costs of operation, including charges for the amount of water used and operational, maintenance and capital replacement costs. United bills those charges to the District on a monthly basis.

In 2007, the District and an enterprise formed by the District (the "**District Enterprise**") entered into a Lease Purchase and Pledge Agreement ("**Lease**") with the United Enterprise. Under the Lease, the District Enterprise agreed to lease the water system from the United Enterprise. This "water system" substantially corresponds with the facilities United agreed to build under the Water Service Agreement, including: (a) the water treatment plant located within the boundaries of the Ravenna District; (b) the approximately 600,-000 gallon underground water storage tank located within the boundaries of the District; (c) 100 acre-feet of storage capacity in the Sutton Pond located within Douglas County outside the boundaries of the District; and (d) carriage rights sufficient to transport water to serve the properties within the District in that certain nine-mile water distribution pipeline running from Plum Creek to the District.

Around the same time, United issued $5.8 million in special revenue bonds that were intended to fund, in part, the construction of the water system. Pursuant to the Lease, the District Enterprise is required to make semi-annual lease payments that are used to pay United's bonds. Upon redemption of the United bonds, the United Enterprise agrees to convey the water system to the District. The District Enterprise agreed to fund the semi-annual payments, in part, through the imposition of a fee on District property owners called the Facilities Acquisition Fee ("**FA Fee**"). The Lease also imposed a "moral obligation" on the District (discussed later) to use its mill levy to cover the Lease payments if the collected FA Fees were insufficient to fund Lease payments.

### C. Economic Downturn & Developer Bankruptcy

When the District originally undertook the Bond and Lease obligations, it estimated that tax revenues collected from the 63 mills would be sufficient to pay the Bonds (approximately 38 mills), the costs of operations and maintenance (approximately 13 mills), and the Lease payments (9–17 mills). These projections were based on an estimated assessed value for the District's real property starting at $13 million in 2008 and rising steadily to $39 million by 2014, as lots were projected to sell and be improved with homes. Unfortunately, the recession caused a significant downturn in the economy, particularly in the real estate market, beginning roughly in 2008. Property values plummeted and the developer was unable to sell lots.

The District's projections turned out to be significantly overstated. In reality, the assessed value of property in the District started at $13.2 million in 2007, peaked at $17.2 million in 2009, and had dropped to $6.1 million by 2014. This caused the District's tax revenue to drop from roughly $1 million in 2009 (the first year Bond payments were due) to $387,308 in 2014. As the revenues shrank, the District had to use more of its mill levy to make the Bond

payments, such that by 2012, 60 of the 63 authorized mills were needed to pay the Bonds, leaving only 3 mills for operations and maintenance, and no mills for Lease payments. Even with 60 mills dedicated toward bond payments, the District was unable to pay the full amount of the interest payments on the dates set forth in the Bond Resolution.

To cover the shortfall in its operations budget, the District began imposing an Operations and Maintenance Fee ("**O & M Fee**") on property owners in 2011. The original fee was $180 per lot, payable in two installments. The District increased the O & M Fee to $2,000 per lot in 2012 and $3,000 per lot in 2014. The District Enterprise also began imposing the FA Fees on lot owners to cover the Lease Payments. While this fee revenue would have greatly helped the District's budget, the situation was further complicated by the fact that a majority of the lots in the development were (and still are) owned by River Canyon, thereby making the developer responsible for payment of most of the fees and property taxes. River Canyon, however, was suffering its own financial difficulties due to the economic downturn. A receiver took over River Canyon's operations in 2010, and it stopped paying its real property taxes and did not pay its fees in full.

The District suffered an additional blow when River Canyon filed for chapter 11 bankruptcy protection on May 23, 2012. This Court presided over River Canyon's bankruptcy case. At the time of its filing, River Canyon owed the District Enterprise approximately $400,000 in assessed and unpaid FA Fees, and approximately $400,000 in assessed and unpaid O & M Fees. River Canyon's bankruptcy prohib-

ited the District and its enterprise from collecting these fees, leaving the District Enterprise unable to cover its Lease payments in 2011 and 2012. Its inability to collect the assessed O & M Fees left the District struggling to cover its operational and maintenance expenses. The District filed a proof of claim in the River Canyon bankruptcy in the amount of $10,387,488.29, consisting primarily of unpaid water tap fees, FA Fees, and O & M Fees.

On July 31, 2013, the Court approved River Canyon's plan of reorganization. The principal of River Canyon, Mr. Jacks, along with other investors, provided substantial post-confirmation financing and in exchange received ownership interests in the reorganized River Canyon. The Court determined that River Canyon's plan was feasible based, in part, on its finding that the market for homes in the development was steadily improving. In its plan projections, River Canyon anticipated paying the FA Fees and O & M Fees that would be assessed against its 166 lots in the future. At confirmation, River Canyon paid off a portion of the FA Fees assessed during the case,[1] and it paid the O & M Fees assessed during the case in full. These payments allowed the District Enterprise to make full Lease payments in 2013 and alleviated some of the District's cash shortage.

### D. Recent Recovery

The Ravenna development has shown steady improvement in the year following River Canyon's emergence from bankruptcy. After not selling any lots for approximately three years, River Canyon sold two lots around the time of confirmation of its

---

1. River Canyon has not paid the District's $140,000 administrative claim for FA Fees due for the second half of 2013.

plan. River Canyon has been actively marketing the development throughout the spring and summer. As of June of 2014, River Canyon had sold six custom home sites within the past six weeks. Within the District, eleven lots and one home have sold in 2014. The lots have sold at prices that are over four to five times their assessed value.

River Canyon recently entered into contract with Remington Homes, in which Remington has agreed to purchase and develop a total of 35 lots over the next three to four years. River Canyon is also working with another builder, Masterpiece Homes, to build a series of attached homes, 52 units, on approximately 24 lots within the District. According to the District's broker, there is a pent-up demand for this type of "paired" home (formerly known as "duplexes"). Thus, the Ravenna development will have a three-prong product line designed to appeal to a wider market. River Canyon has also broken ground on its new golf clubhouse.

At the time of trial, Douglas County had not yet completed its 2014 assessed valuation of property in the District for the 2015 budget/fiscal year. By statute, the county assessor only reappraises property in every odd-numbered year. As a result, the 2014 assessment will not be based on a reappraisal, but will instead rely on the 2013 valuation (which was, in turn, based on comparable sales from the period of 2010–2012), with adjustments only for changes to the condition of the property, such as new construction, through June 2013. Given this reliance on past market data, the District's financial projections assume little increase in the 2014 assessed value.

### E. History of Negotiations

The District started informal negotiations with CBS and United concerning its financial situation as early as 2009 or 2010. Numerous meetings were held, many of which included the District's bankruptcy counsel. In August 2011, the District and CBS negotiated a forbearance agreement that allowed the District to defer a scheduled payment on the Bonds for approximately six months. In late 2011, Mr. Alan Pogue became general counsel for the District. He met several times with Mr. Fred Kelly, a principal of CBS, to discuss the District's finances. Mr. Kelly also met with the District's bankruptcy counsel. On May 16, 2012, CBS and the District entered into a second forbearance agreement, whereby CBS agreed to allow $250,000 of pledged tax revenues to be used to cover the District's operational and maintenance expenses.

Other than the forbearance agreements, the parties failed to reach a consensus as to how to address a more long term solution to the District's financial situation. This was due, in large part, to the parties' very different views on whether restructuring the Bonds was necessary. The District was pushing for a significant restructuring. For example, on August 2, 2012, Mr. Pogue sent CBS a letter outlining a proposal, which permitted the District to use its mill levy to pay all of its operating expenses first before any payment of the Bonds or Lease, as well as a significant reduction in the interest rate. Mr. Pogue explained that the District wanted this form of restructuring so it could eliminate both the O & M Fees and the FA Fees, which the District believed were "burdensome" and "too high for the development to survive." Mr. Pogue's letter forecasted that, absent such a restructuring, the District would file bankruptcy.

This was not the first time the District had openly contemplated bankruptcy. In April of 2012, Mr. Jacks made a presentation to the public explaining that the Dis-

trict's strategy was to file a chapter 9 petition if CBS did not agree to restructure the bonds within the next sixty days. On September 27, 2012, Mr. Jacks made another presentation to the District's board regarding the filing of a potential bankruptcy petition. When asked by a homeowner if there were any negative repercussions associated with a bankruptcy filing, Mr. Jacks responded that "he did not see any negatives in moving forward." Ex. 94, at RMD1174. On behalf of CBS, Mr. Kelly attended the same board meeting. During the meeting, he introduced himself to the board, and told them that he did not believe that the District needed to file bankruptcy. He explained that present negotiations were already difficult due to River Canyon's existing bankruptcy case.

In the spring of 2013, representatives of the District and CBS attended a two-day mediation with River Canyon and United. In connection with the mediation, the District submitted another written proposal regarding restructuring the Bond debts that was substantially similar to its prior proposal. This one proposed that the District would use the first $500,000 of tax revenue to pay operations and maintenance prior to payment of the Bonds or the Lease, that the interest on the Bonds would be decreased, and that the O & M Fee would be eliminated and the FA Fee reduced by 50%. The parties were unable to reach a resolution through mediation, but shortly thereafter, CBS submitted a written proposal to the District's board. In the letter, Mr. Kelly proposed that CBS would lend the District $400,000 at 6% interest to cover operating expenses. CBS proposed that the District could repay the loan with either an additional mill levy of 35 mills (thereby increasing the total mill levy to 98 mills) or by imposing a fee in an amount equivalent to a mill levy of 35 mills. Mr. Kelly also expressly stated that "[i]t is my opinion that the interests of the District are best served by not attempting to restructure of [sic] the District's bonds at this juncture." Ex. 26, at 5.

In late 2013 and early 2014, Mr. Jacks began espousing his new theory that the O & M Fees and the FA Fees were unconstitutional and/or illegal under state law. He presented the District's counsel with a draft complaint in which River Canyon would seek declaratory judgment to this effect. At the December 13, 2013 board meeting, Mr. Jacks informed the board that the District could assess the O & M Fees, but he (and River Canyon) would not pay it, despite the fact that he had already confirmed River Canyon's plan based on projections that assured payment of these fees. The District nevertheless voted to impose a $3,000 O & M Fee for 2014. However, when setting a due date for the O & M Fees, the board only imposed a deadline for the first half of the fee ($1,500), and left the second half's due date undetermined. The board also declined to consider imposition of a FA Fee for 2014. According to Mr. Jacks, the board's reluctance to impose the fees was due in part to a discussion during the board meeting about the legality of the fees that ensued after he voiced his refusal to pay them.

At that same meeting, the District established a revised water tap fee for new three-quarter inch water taps of $16,000 per tap. This amount was less than half the amount that the District had been charging for water taps up to this point in time. The board further agreed to provide River Canyon with a 50% discount for a bulk water tap sale—25 taps for $8,000 each. One of the District's board members, Mr. Maul, voted against this deal because he did not believe it was in the best interest of the District to discount the tap fees by that amount. After that board

meeting, Mr. Maul resigned from the board because he did not approve of the direction in which the Board was headed. Mr. Jacks had also resigned from the District's board by this time, but he was appointed in January 2014 to serve on the board's chapter 9 litigation committee.

By January 2014, the District replaced its bankruptcy counsel with Sender & Wasserman, the same firm that had also represented and still represents River Canyon in its chapter 11 bankruptcy case. In February 2014, the District's new counsel sent a letter and a draft chapter 9 plan on substantially the same terms as prior offers. The proposed plan transmitted in late February is· substantially similar to the one currently filed in this case. It calls for elimination of the O & M and FA Fees, treating CBS' claim as unsecured, and the rejection of the Lease. The letter also argues that the proposed plan is the only feasible solution to the District's financial situation because property owners in the District are asserting the fees are illegal and, therefore, the District cannot rely on those fees.

Two weeks after receipt of this letter, Mr. Kelly met with the District's representatives. Although Mr. Jacks was no longer an official member of the board, he attended the meeting as a member of the District's chapter 9 litigation committee. A sticking point in the negotiations was whether the District would continue to impose and collect fees. Once again, the parties were unable to reach an agreement. Shortly after the meeting, however, counsel for CBS sent a letter to the District in mid-March reiterating Mr. Kelly's prior offers to provide financing for operational costs and to defer interest payments, and promising a formal restructur-

ing proposal. When no written proposal was immediately forthcoming, the District filed its chapter 9 bankruptcy petition on April 2, 2014. Both CBS and United filed objections to the District's petition, arguing it does not meet the eligibility requirements set forth in 11 U.S.C. § 109(c) and that the petition was not filed in good faith and should be dismissed under § 921(c).

## II. DISCUSSION

Eligibility for chapter 9 relief is governed by Bankruptcy Code §§ 101(32)(C), 101(40), 109(c), and 921(c) and (d).[2] Under § 109(c):

An entity may be a debtor under chapter 9 of this title if and only if such entity—

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer· or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

---

**2.** All references to "section" or "§" shall refer to Title 11, United States Code, unless expressly stated otherwise.

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c).

The requirement in § 109(c)(2) that a chapter 9 debtor be "specifically authorized" to file a petition implicates state law. Under Colorado law, only "insolvent taxing districts" are authorized to file a bankruptcy petition. Colo.Rev.Stat. § 32-1-1403. An "insolvent taxing district" is defined as

a taxing district which is able to show to the United States bankruptcy court in and for the district of Colorado that it has been unsuccessful with other existing alternatives to bankruptcy and which would be unable to discharge its obligations as they become due by means of a mill levy of not less than one hundred mills . . . .

Colo.Rev.Stat. § 32-1-1402.

In addition to the § 109(c) requirements, there is also a good faith requirement. Section 921 of the Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith. . . ." 11 U.S.C. § 921(c).

■ Other than the first element (that the debtor must be a municipality) and the fourth element (that the debtor desires to effect a plan to adjust its debts), the parties dispute each of the remaining elements. The District bears the burden of establishing eligibility. *Hamilton Creek Metro. Dist. v. Bondholders Colo. BondShares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384 (10th Cir.1998) **(the "Hamilton Creek decision," the "Hamilton Creek case," or "Hamilton Creek").**

Thus, if the District fails to establish even of one of the necessary elements, it will be deemed ineligible.

## A. Insolvency

■ To be eligible for chapter 9 relief, a municipality must prove it is insolvent under at least one of the Bankruptcy Code's two tests for insolvency. An entity must either be "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C). The first test (referred to as the "current-state-of-affairs" test) looks at current, general nonpayment, while the second test (referred to as the "forward-looking test") looks to future inability to pay. These tests are applied as of the date of the petition. *Hamilton Creek*, 143 F.3d at 1385–85. The District asserts it is insolvent under both tests. It claims it has not been paying when due and is unable to pay in the future three categories of debts: the Bonds, the Lease, and its general operational and maintenance costs.

### 1. Current Insolvency Test

The current-state-of-affairs test may be broken down into three distinct elements.

(i) "Generally" (which implies a test of proportionality);

(ii) Not paying debts as they fall "due;"

(iii) Unless the debts are subject to a "bona fide dispute."

11 U.S.C. § 101(32)(C)(i). For the reasons set forth below, the Bonds are not "due," the Lease is subject to a bona fide dispute, and the District has sufficient ability to fund its existing operational and maintenance costs.

668

### a) Bond Debt

■ The District's largest and most onerous obligation is the indebtedness owed on the Bonds, which the District calculates to be $13.6 million as of the petition date. CBS argues this debt is not actually "due," according to the controlling precedent set forth in the *Hamilton Creek* decision. Like this case, the *Hamilton Creek* case involved a metropolitan district that issued bond debt to fund a development project. The district had filed a previous chapter 9 case and confirmed a plan that restructured its bonds. The plan provided the bonds' new terms, including semi-annual interest payments. Payment of interest was only required on the installment dates to the extent district funds were available after the payment of maintenance and operational expenses and the required deposits had been made to the district's capital fund. When the development did not progress as planned, the district filed a second chapter 9 case. The Tenth Circuit upheld the bankruptcy court's determination that the district was ineligible for chapter 9 relief because it had failed to establish insolvency.

The Tenth Circuit's analysis focused on the meaning of the term "due," which is used in both the current-state-of-affairs and the forward-looking tests in § 101(32)(C). It held that "due" means "presently, unconditionally owing *and presently enforceable.*" *Id.* at 1385 (emphasis added). Applying this definition to the district's interest obligation on the restructured bonds, the Tenth Circuit held that such payments were "indefinitely contingent on the availability of certain Plan-defined funds" and, thus, were not presently, unconditionally owing, nor presently enforceable. *Id.* The Court emphasized that it is not enough to merely present evidence indicating there are amounts owed by a debtor without indicating when the amounts are actually payable. The Tenth Circuit concluded:

> In this case, there was evidence that the District's interest obligations were arising, and would continue to arise, upon each semi-annual installment date. There was, however, no evidence of when the interest payments were or would be actually payable—no evidence of a date certain appointed for payment, and no evidence of when the bondholders expected or expect payment. On the contrary, the Plan's adjustment of the District's debts contemplated the possibility of little or no payment for years, and the possibility that the interest might never be fully paid. Thus, the District failed to marshal the necessary evidence to show that its interest payments were becoming or would become "due" under § 101(32)(C).

*Id.* at 1385–86.

Unpersuaded by the district's emphasis on the semi-annual installment due dates provided for in the plan, the Tenth Circuit concluded that the significance of the dates was diminished by the engraftment of a "fund-availability" contingency on those payments. Since there was "no risk of default" on the interest and principal payments and the bondholders had no presently enforceable right to payment nor a future prospect of such a right, the district had no real need for the protections offered by chapter 9, such as the automatic stay. *Id.* at 1386.

Even if the interest payments were "due," the Tenth Circuit held that the district had failed to demonstrate an inability to pay under the forward-looking test, since under that test, insolvency is measured on a cash-flow basis. The district's interest obligation was contingent on cash flow, and, thus, this obligation would never cause it to have a negative cash balance. *Id.* at 1386 ("[U]nder a cash-flow analysis

of insolvency, obligations that are enforceable only on a cash-flow basis cannot, by definition, render a debtor insolvent."). The Tenth Circuit concluded that inability to pay under the forward-looking test "depends upon the inescapable quality of the obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough." *Id.* (quoting *In re Town of Westlake, Tex.*, 211 B.R. 860, 865 (Bankr.N.D.Tex.1997)). In that case, the district's bond debt was "perpetually escapable." *Id.* The *Hamilton Creek* court recognized that the district had "financial difficulties," but held that because it was "not in breach" of its bond obligations, it was not insolvent and not eligible for chapter 9. "Chapter 9 does not offer relief to a municipality simply because it is economically distressed." *Id.* at 1387.

While there are some differences discussed below, the payment obligation on the Bonds in this case is substantially similar to the *Hamilton Creek* case's plan obligation. The Bond Resolution also has a payment contingency built into its structure. The Bond Resolution sets the amount of interest due and the "due date" for those payments.[3] At the same time, the District's obligations under the Bond Resolution are limited. It must impose the Required Mill Levy, which is defined as a mill levy in an amount sufficient to pay the principal and interest on the Bonds but not to exceed 60 mills. The District must also then apply the pledged revenue received from the Required Mill Levy toward payment of the Bonds. In other words, once the District has paid over any collected tax revenue from 60 mills, it has met its payment obligations. There is no requirement that the District pledge more than 60 mills or apply reve-

nue from other sources if the 60 mills does not result in enough funds to make the full interest payment. In fact, the Bond Resolution contemplates that the District will make "partial payments" if the designated funds are insufficient to make a full payment. Ex. 4, § 19(d).

The failure to make a full interest payment is not a defined as an "Event of Default" in the Bond Resolution. Ex. 4, at § 13.01. The only defined events of default are the failure to impose the mill levy, the failure to honor the covenants and duties set forth in the Bond Resolution, and the entry of an order for relief declaring the District bankrupt. The latter event has not occurred. While the District has filed a chapter 9 petition, an order for relief will not enter unless and until the Court denies the objections to the petition and overrules the bad faith filing challenge.

Moreover, according to the Tenth Circuit, the definition of "due" also requires a finding that the debt is "presently enforceable." *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1385 (10th Cir.1998) (quoting Black's Law Dictionary 499 (6th ed. 1990)). The only remedies given to the bondholder in the event of a default is to bring an action to require the District to impose the mill levy and to turnover funds actually collected to be applied toward payment of the Bonds. The Bond Resolution explicitly states that "acceleration shall not be an available remedy." Ex. 4, at 28. In other words, CBS can force the District to levy, to collect taxes, and to transmit the taxes collected to CBS, but it cannot accelerate the debt, foreclose on the property, or attempt any other means of collection against the District. Failing to make a full

---

**3.** The Bond Resolution also sets a redemption schedule when the principal of the bonds will be repaid. The earliest mandatory redemption date is 2024.

interest payment triggers no remedies as long as the District has turned over the taxes actually collected. Under these circumstances, a partial payment does not provide CBS with grounds to enforce any rights. The bond owner has no remedy other than to wait until the District's tax revenues rise to a level sufficient to make the required payments.

This interpretation is reinforced by the Offering Memorandum that the District authorized in conjunction with issuance of the Bonds. That Memorandum provides that:

> ***Insufficiency of Pledged Revenue Not an Event of Default.*** *The Pledged Revenue and the amounts on deposit in the funds and accounts established by the Bond Resolution may not necessarily be sufficient to pay when due the principal of, premium, if any, and interest with respect to the Series 2007 Obligations and any Parity Bonds. However, so long as the District neither fails nor refuses to impose the Required Mill Levy or to apply the Pledged Revenue as required by the Bond Resolution, the inability of the District to pay the debt service requirements with respect to the Series 2007 Obligations when they come due does* not *constitute an event of default under the Bond Resolution. . . . If the principal of any Series 2007 Bond is not paid when due, such principal will remain outstanding until paid, and if the interest on any Series 2007 Bond is not paid when due, such interest will compound semiannually on each interest payment date for the Series 2007 Obligations at the interest rate borne by such Bond; provided, however, that the District will not be obligated to pay more than the amount permitted by law. . . .*

Ex. 62, at 4–5 (emphasis original).

The District attempts to distinguish the *Hamilton Creek* decision, pointing out no less than eight differences in the language used in the Hamilton Creek plan, but these differences are immaterial to the fundamental underlying analysis. First, it points to the difference in the amount of the interest payments and the size of the past due amount on the date of the petition ($9,000 versus $1,505,062). Nothing in the Tenth Circuit's analysis placed any weight on the size of the unpaid interest debt, as long as it contained a "fund-availability contingency." *Hamilton Creek*, 143 F.3d at 1386.

Second, the District points out that interest payments on the Bonds were immediately due, without a significant grace period. Again, this distinction has no bearing on the analysis. Third, it asserts that the Hamilton Creek plan obligation listed no events of default, but the Bond Resolution lists three events of default. As discussed above, none of the three events of default in the Bond Resolution are triggered by failing to make a full interest payment by its scheduled due date.

Fourth and fifth, the Hamilton Creek plan allowed the district to use collected taxes to pay costs of operations and to fund capital improvements, before turning over the remaining balance to fund bond payments. In this case, the District is expected to fund its operations from the remaining mill levy of 3 mills, which is presently insufficient to fully fund operations. Instead the District is expected to impose certain fees on homeowners to fund the difference. The District is presently unwilling to assess and collect these fees, which will be discussed in detail later. While this is a difference that is significant in terms of funding the District's operations, and the Court will return to this issue in connection with the bad faith filing

challenge, it is not relevant to the legal analysis as to whether the Bonds are presently "due" and "enforceable."

Sixth, in Hamilton Creek, with each reference to a payment due date, the plan included the phrase "to the extent of the amount of Debt Service Funds available." Ex. C–79, at 5. In this case, the Bond Resolution merely has a separate provision in section 19(d) that allows for partial payments in the event that funds are not available to make full payments. Whether the operative document contains multiple references or one separate reference is a distinction without a difference. The bottom line is that both the Hamilton Creek plan and the Bond Resolution contain a "fund-availability" contingency provision.

Seventh, the District claims that the Hamilton Creek debt contained no maturity date. Section 4.3.2 of the Hamilton Creek plan, however, listed the maturity dates of the various bonds. Ex. C–79, at 5. The Tenth Circuit construed the "fund-availability" provisions to render the payment obligations "unmatured," despite the stated dates of maturity. Similarly, the Bond Resolution contains a maturity date, but the fund-availability provision nullifies the maturity date to the extent that funds are unavailable to make payments. Finally, the District argues that the Tenth Circuit's failure to mention the Colorado statutory definition of an "insolvent taxing district" has significance to this analysis, but the Court is at a loss to see how it changes the legal significance of the "fund-availability" contingency provision.

■ It is more than a little ironic that the District, as the obligor, is the one arguing that the Bonds are past "due" and "presently enforceable" and it is the bondholder who is arguing to the contrary. If the obligee takes the legal position that these Bonds are not due and enforceable,

why should the District dispute it? "The purpose of chapter 9 is to temporarily protect a debtor from collection actions so that it may establish a repayment plan with its creditors." *Hamilton Creek*, 143 F.3d at 1386 (citations omitted). Here CBS is taking no action to collect on the unpaid interest payments. Moreover, it has entered into two forbearance agreements with the District to allow it to use funds for operations that would otherwise be required to be paid toward the interest payments. It is also willing to lend the District additional funds to cover the cost of operations for its temporary shortfall in the future. Thus, the underlying purpose of chapter 9 and the need for the automatic stay do not exist here. There is, however, another motivation behind the District's filing that the Court will address later.

### b) The Lease Obligation

■ The District has asked the Court to consider the payment default on the Lease as further evidence that the District is insolvent. The Bankruptcy Code is clear that, for insolvency purposes, a municipality must be unable to pay "*its* debts as they become due." 11 U.S.C. § 101(32)(c)(ii) (emphasis added). The Lease is a three-party agreement between the United Enterprise, the District Enterprise, and the District. While the District is one of the parties to this agreement, there is a significant legal question as to whether the payment obligations under the Lease are legally enforceable against the District. CBS and United have argued that only the District Enterprise is legally obligated to make payments and, therefore, this is not a debt of the District. The District counters that a water activity enterprise is not legally separate from the government that owns it and, thus, a debt of an enterprise is a debt of the district as well. Having

reviewed the applicable statutes, the published Colorado court decisions construing them, the Lease, and the Moral Obligation Resolution associated with the Lease, and having heard the conflicting testimony of three experts in the field of special district law, the Court concludes that there is a bona fide dispute as to whether the District can be held liable for the Enterprise's payment obligations under the Lease. The presence of a bona fide dispute provides a sufficient basis for excluding consideration of this debt as evidence of insolvency.

■ The Bankruptcy Code does not itself define the term "bona fide dispute." This same phrase, however, is used in the context of involuntary petitions filed against a debtor. 11 U.S.C. § 303(b). In that context, if the petition is controverted, the bankruptcy court shall enter an order for relief only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute...." 11 U.S.C. § 303(h)(1). In interpreting the same phrase used in the very similar context of an involuntary petition, the Tenth Circuit has adopted as its test that "the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *Bartmann v. Maverick Tube Corp. (In re Bartmann)*, 853 F.2d 1540, 1544 (10th Cir.1988) (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir.1987)). As demonstrated below, there is a serious legal question as to whether the debt obligation arising under the Lease is a legally enforceable debt of the District.

To begin this analysis, some general understanding of applicable Colorado law is necessary. In 1992, Colorado voters approved the passage of an amendment to the Colorado Constitution, known as the "Taxpayer's Bill of Rights" or "**TABOR.**"

Colo. Const. Art. X, § 20. Under this provision, Colorado's state and local governments have had significant limitations placed on their taxing, revenue producing, and spending authority. Their ability to enter into multi-year debt obligations was also curtailed. These limitations may be exceeded only with voter approval. TABOR declares that its provisions should be interpreted with an eye toward fostering its essential purpose of "reasonably restrain[ing] ... the growth of government." Colo. Const. Art. X, § 20(1). By inference, this goal is premised on a desire to alleviate the burden of increased taxes on the citizens of this state. Thus, TABOR restricts governmental units that have the ability to levy general taxes.

The restrictions, however, only apply to "districts." TABOR defines a "district" as "the state or any local government, excluding enterprises." Colo. Const. Art. X, § 20(2)(b). The term "enterprise" refers to "a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined." *Id.* at § 20(2)(d). By way of contrast, enterprises do not have the power to levy taxes. They are businesses. "The term 'business' is generally understood to mean an activity which is conducted in the pursuit of benefit, gain or livelihood." *Nicholl v. E–470 Public Highway Auth.*, 896 P.2d 859, 868 (Colo. 1995). In *Nicholl*, the "authority" was organized for the specific purpose of financing, constructing, operating, and maintaining the E–470 highway. It financed these activities primarily from the collection of tolls and user fees. However, a majority of the Colorado Supreme Court justices held that it also had the authority to exercise taxing powers. It had not yet done so, but the majority held that its ability "to levy general taxes is inconsis-

tent with the characteristics of a business." *Id.* at 869. On this basis, the court held that the authority was a "district" (rather than an enterprise) and, therefore, it was subject to the limitations and voter approval requirements set forth in TABOR.

Since the enactment of TABOR, the enterprise vehicle has been commonly employed to finance the creation and operation of water and sewer systems. The necessary capital investment is considerable and often involves multi-year contracts. Absent enterprise status, a district would have to obtain voter approval. To surmount this obstacle, the Colorado General Assembly enacted a statutory scheme that allows for the establishment of "water activity enterprises," defined as "any government water activity business owned by a district, which enterprise receives under ten percent of its annual revenues in grants from all Colorado state and local governments combined and which is authorized to issue its own revenue bonds...." Colo.Rev.Stat. § 37–45.1–102(4). Each water activity enterprise must be wholly owned by a single district. Colo.Rev.Stat. § 37–45.1–103(2)(a). Its governing body "shall be the governing body of the district which owns the enterprise or such [other] governing body as may be prescribed...." Colo.Rev.Stat. § 37–45.1–103(3). The governing body of each water activity enterprise "may exercise the district's legal authority relating to water activities, but no enterprise may levy a tax which is subject to [TABOR]." Colo.Rev.Stat. § 37–45.1–103(4).

To this Court's knowledge, there have been no reported decisions directly addressing the question of whether an enterprise is legally distinct from its parent or governmental owner. One commentator has described the "enterprise function" as "separate from the governmental function of the governing body...." Gregory J.

Hobbs, Jr., *Water Activity Enterprises*, 22 Colo. Law. 2555, 2556 (Dec.1993). Referring to separate "functions" sounds as though all of the activities are those of the district and not those of a district and of its separate enterprise. In their testimony, the District's experts opined that the district and the enterprise were one and the same. Neither the experts nor this commentator, however, presented anything other than a conclusory statement to this effect.

The District urges this Court to apply a simple dictionary definition to the term "enterprise" as a "project or undertaking" or an "activity." *See* Merriam Webster, http://www.merriam-webster.com/ dictionary/enterprise. Based on this definition, the District concludes that an enterprise is merely a project of the district. Another dictionary's definition, however, also defines it as a "business organization." The Free Dictionary, http://www.thefree dictionary.com/enterprise (citing The American Heritage Dictionary of the English Language (4th Ed. 2000)). Another includes "a business unit; a company or firm." *Id.* (citing Collins English Dictionary—Complete and Unabridged (2003)). The term "business" is also susceptible to different meanings. It has been defined as a "person, partnership, or corporation engaged in commerce, manufacturing, or a service; profit-seeking enterprise or concern." Dictionary.com, http://dictionary. reference.com/browse/business. It is sometimes defined as a "commercial or mercantile activity engaged in as a means of livelihood." Merriam Webster, http:// www.merriam-webster.com/dictionary/ business.

Unfortunately, the water activity enterprise statutes themselves send conflicting signals as well. Some provisions support the District's interpretation. Section 37–45.1–103(4) states that the enterprise "may

exercise the district's legal authority relating to water activities...." Colo.Rev. Stat. § 37–45.1–103(4). Subsections 37–45.1–106(2) and (3) refer to the district collecting revenues for the services rendered by its enterprise and that such collections will not be deemed a tax or subject to TABOR restrictions. Colo.Rev.Stat. § 37–45.1–106(2)–(3). The District argues that the fact that a district collects its enterprise's revenues and, in this case, the District Enterprise does not even have its own separate bank account as evidence that it is not a separate entity.

The District also distinguishes the language in Colo.Rev.Stat. §§ 29–1–204(u) and 29–1204.2(4), which allows governmental units to enter into contracts to establish a "separate governmental entity" to become an electric power authority or a water or drainage authority. These statutes clearly specify that the separate entity created will be a "political subdivision and a public corporation of the state." *Id.* No such language appears in the water activity enterprise statutes.

In addition, the District points to the language in Colo.Rev.Stat. § 37–45.1–105(3) that refers to payments made by a state or local government for services rendered. When such payments are made "to a district or its water activity enterprise," they shall not constitute a "grant" to the enterprise. Colo.Rev.Stat. § 37–45.1–105(3). The option to pay either the district or its enterprise, the District concludes, supports its interpretation that they are one and the same legally. The Court does not, however, read this meaning into this provision. The intent of it is to make a distinction between "grants" and payments for services. For example, if this language were applied to the present case, it would mean that when the District pays the United Enterprise for water under the Water Service Agreement, the payment will not be deemed a grant to the United Enterprise, even though technically the United Enterprise may be receiving funds from a local governmental entity.

Additional language in this same section supports the interpretation of CBS and United that the Enterprise is a distinct entity. The statute makes a distinction between contracts and loan agreements entered into by an enterprise and those that "in whole or in part constitute a general obligation of such local governmental entity or district," the latter of which requires the district to comply with TABOR. Colo.Rev.Stat. § 37–45.1–105(3). If the obligations of the enterprise were always synonymous with those of the district, then TABOR compliance would always be mandated.

More importantly, the overarching statutory scheme contemplates establishing and maintaining a water activity enterprise as something separate from the district that owns it in order to claim the exemption from TABOR's restrictions. Treating them as indistinct nullifies the purpose of these special provisions. The clear intent of these statutes is to treat the contracts and agreements of the enterprise as distinct from the contracts and agreements of the district, unless the particular contract expressly obligates both the district and its enterprise. Moreover, it is quite a leap to conclude, as the District does, that if an enterprise fails to qualify as an enterprise in a particular year, then its debts become the debts of the district. Nothing in the water activity enterprise statutes supports this conclusion. The only consequence set forth in TABOR itself for a violation of TABOR's requirements is that a taxpayer may bring suit to require the district to refund the revenue collected, kept, or spent illegally. Colo. Const. Art. X, § 20(1). In *Nicholl v. E–470 Public Highway Authority*, 896 P.2d 859 (Colo.1995),

the court held that the authority was a district rather than an enterprise, due to its taxing powers, but it did not then declare the bonds that had been issued to have been the debt of the various governmental entities that had established the authority. Instead it merely held that the authority had to obtain voter approval before proceeding further with its plans to finance the next phase of construction of the highway.

In the present case, the language of the Lease itself is also ambiguous on this issue. Its cover page and introductory paragraph send conflicting signals. It indicates that this contract is between United "acting by and through its" Enterprise, the District "acting by and through its" Enterprise, and the District itself. On the one hand, if the District and the District Enterprise were legally indistinct, there would be no need to name the District as a party to it. On the other hand, the phrase "acting by and through its" enterprise seems to imply it is still the district that is entering into the contract. The District also points out that Article IX of the Lease makes numerous references to the Water Service Agreement and the District, rather than the District Enterprise. It sets forth obligations of the District and, therefore, it is not the case that only the Enterprise has obligations under the Lease. It is understandable why the Lease would reference the District's obligations under the Water Service Agreement, however, because this agreement predated the creation of the District Enterprise and was entered into by the District itself.

Significantly, Article VI of the Lease indicates that the District Enterprise is the only party that has the obligation to make lease payments. However, in Article XI, the District agrees that, if there is an anticipated shortfall in the District Enterprise's ability to pay lease payments from the imposition of FA Fees, then the District will certify an operations mill levy sufficient to make up the shortfall. This Article and Section 11.01 within it contain the heading or caption of "Moral Obligation of Ravenna District." Section 11.02 is captioned, "Moral Obligation Subject to Annual Appropriations; Not a Multiple–Fiscal Year Obligation." Ex. 11, at § 11.02.

■ Black's Law Dictionary defines a "moral obligation" as "a duty which is valid and binding in conscience and according to natural justice ... that is, one which rests upon ethical considerations alone, and is not imposed or enforced by positive law." *Black's Law Dictionary* 1074 (6th ed. 1990). Courts have construed "moral obligation" provisions as unenforceable. *See Cross v. McNichols*, 118 Colo. 442, 195 P.2d 975, 976 (1948) (holding that "moral obligations" are not legally enforceable); *Doe v. Roman Catholic Archdiocese of Indianapolis*, 958 N.E.2d 472, 477 (Ind.App. 2011) ("[A] moral obligation to perform an agreement does not provide sufficient consideration to support the enforcement of an agreement nor does it create an enforceable contract"); *In re Submission of Interrogatories on House Bill 99–1325*, 979 P.2d 549, 555 n. 4 (Colo.1999) (noting that bonds that do not legally bind a legislature but that create a moral obligation to appropriate money in the future are referred to as "moral obligation bonds."). A moral obligation alone cannot satisfy the Hamilton Creek court's definition of a debt that is "presently, unconditionally owing and presently enforceable." *Hamilton Creek Metro. Dist. v. Bondholders Colo. BondShares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1385 (10th Cir.1998).

The District points out that, in the standard boilerplate provisions at the end of the Lease in Art. XIV, § 14.10 entitled "Captions," it states that captions and

headings "are for convenience only and in no way define, limit, or described [sic] the scope or intent of any provisions or sections of this Agreement." Ex. 11, at § 14.10. Without the caption, §§ 11.01 and 11.02 of the Lease read as though they were imposing a conditional obligation on the District to certify the mill levy to cover any shortfall on a yearly basis, without any qualification that these are moral obligations only. However, § 11.01 also references an appropriation of moneys "pursuant to the Moral Obligation Resolution and this Section 11.01." Ex. 11, at § 11.01. Thus, the Court finds the Lease to be ambiguous on this issue and it is therefore appropriate to consider parole evidence as to the intent of the parties. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154–55 (10th Cir.2008) (construing Colorado law). The best evidence of the District's intent is set forth in the June 25, 2007 Resolution of the District, otherwise known as the Moral Obligation Resolution. Ex. C–151. In numerous provisions of this resolution, the District states that the obligation to appropriate funds for the purpose of making lease payments is "non-binding," a "moral obligation," and its board may "in its sole discretion determine to make such an annual appropriation, but is never required to do so." *Id.* While the resolution is a statement only of the District, CBS and United have confirmed in their written submissions that they also shared this understanding that the District's obligation was a "moral obligation only."

To say the least, there is a serious legal question as to whether the payment obligations under the Lease represent a legally enforceable debt of the District. Consequently, there is a bona fide dispute as to the Lease and, therefore, it may not be considered as evidence of the District's current insolvency.[4]

### 3. Other Debts

■ According to a summary submitted by the District, it owed approximately $77,000 on the petition date. Of this amount, approximately $32,000 was attributable to disputed amounts claimed due by United under the parties' Water Service Agreement, which cannot be considered as evidence under the current-state-of-affairs insolvency calculation. Of the trade invoices submitted by the District, only $13,919.12 was past due on the petition date.[5]

The District pays its operating bills from its Chase Bank account. On the petition date, this account held $52,154.26. According to testimony of the District's manager, Mr. Dowswell, only $12,000 to $15,000 was available for unrestricted use. The balance of the account funds was held as pledged revenue. Therefore, on the petition date, the District either had sufficient unrestricted funds to pay its outstanding trade debts, or the amount it lacked was de minimis. The current-state-of-affairs insolvency test requires a showing that the District is "generally" not paying its debts as they fall due. Under any definition of the term "generally," this evidence does not satisfy this test.

4. In fact, in its list of creditors and claims pursuant to 11 U.S.C. §§ 924 and 925, the District listed the Lease obligation as a "disputed" debt.

5. The Court acknowledges that both parties submitted different numbers (CBS claimed $20,000 and the District asserted $22,678.59).

The document submitted for "Roxborough" was not an invoice and it is difficult to tell what this document represents. Many of the invoices either had no due date or the due date fell after the April 2, 2014 petition date. Those which had a due date prior to April 2 amounted to only $13,919.12.

Moreover, the petition date balance of the Chase Bank account was not a typical balance. It had been substantially depleted in the week prior to the bankruptcy filing, when the District paid its bankruptcy counsel $119,233.00 and its general counsel $31,876. Shortly after the bankruptcy filing, the Chase Bank account held an ending balance on April 30, 3014 of $137,712.28 and it had an ending balance of $157,158.87 on May 31, 2014.

For all of the forgoing reasons, the Court finds that the District has not met its burden of showing it is insolvent under the current-state-of-affairs test.

### B. Future Insolvency Test

The second test of insolvency, known as the forward-looking test, is simply defined in the statute as "unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C)(ii). It has no "generally" qualification nor an exception for debts subject to a bona fide dispute. "Under this test, insolvency is analyzed on a cash-flow basis." *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.),* 143 F.3d 1381, 1386 (10th Cir.1998) (citing *In re City of Bridgeport,* 129 B.R. 332, 337 (Bankr.D.Conn.1991)). Inability to pay under this test "depends upon the inescapable quality of the obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough." *Id.* The maturity of the debt must be "imminent" and the inability to pay it must be "certain." *Id.*

Applying this test first to the Bonds, they will never cause the District to suffer a negative cash balance because of the "fund-availability contingency" in the bond instruments. "Indeed, under a cash-flow analysis of insolvency, obligations that are enforceable only on a cash-flow basis cannot, by definition, render a debtor insolvent." *Hamilton Creek,* 143 F.3d at 1386. Instead the debt remains "perpetually unmatured to the extent such funds are unavailable. Furthermore, the debts are far from having an 'inescapable quality'; rather, their contingency leaves them perpetually escapable." *Id.* at 1387.

In considering the Lease obligation under the forward-looking test, the Court cannot rely on the bona fide dispute as to the Lease's enforceability against the District. Assuming for the purpose of this test only that the Lease represents a debt of the District, the Court nevertheless finds that the District has failed to prove with certainty that this debt cannot be paid in the future. The District has 243 lots within its boundaries. The District Enterprise has the ability to impose FA Fees to cover the Lease payments. It has previously imposed FA Fees of $2,050 per lot. By collecting these fees, the District Enterprise would realize approximately $500,000 in revenues per year. The payments due under the Lease are $500,000 per year. The District presented no evidence that the property owners in the district were unable to pay these fees on a yearly basis.

Admittedly, the District did not make the full Lease payment in 2011 or 2012. This default is directly tied to the developer's nonpayment and bankruptcy filing. River Canyon currently owns approximately 70% of the lots in this development. At the time of its bankruptcy filing, River Canyon owed approximately $400,000 in FA Fees for 2011 and 2012.

However, when River Canyon emerged from bankruptcy in 2013, it was required to pay all of the FA Fees that had accrued during the pendency of its case as a condition of confirmation of its plan. As a result, the District Enterprise was able to

make its 2013 Lease payments in full. Not only did the District Enterprise collect from River Canyon, but it also instituted collection actions against other property owners that had not yet paid their FA Fees. Specifically, there were seven delinquent accounts in October 2013. The Board sent out notices that these accounts would be certified to Douglas County to be collected with taxes. Six paid prior to certification. Only one property owner was actually certified to the County.

In fact, through the payments made by River Canyon during the course of its bankruptcy, the District Enterprise was able to make up a portion of the 2012 deficiency. If the District Enterprise were simply to pursue its pending administrative expense claim of $140,000 in the River Canyon bankruptcy, the deficiency for the 2012 lease payment would be significantly reduced.

This brings the Court to the 2014 FA Fees. By as late as August 2014, the Enterprise had not yet assessed the full FA Fees for 2014. The District asks the Court to find it eligible for chapter 9 relief on the basis that it has no hope of financing its ongoing operations without the ability to restructure its debts in bankruptcy, but it refuses to take the simple action of assessing the very fees that would enable it to pay its future Lease obligations. Instead it now claims that these fees may be "unconstitutional." First, only a taxpayer, and not the District nor its Enterprise, has standing to assert a violation of TABOR. Colo. Const. Art. X, § 20(1); *Nicholl v. E–470 Public Highway Authority,* 896 P.2d 859, 866 (Colo.1995). Moreover, the Court can think of no legitimate basis for the District or its Enterprise to take this position. It is only the land owners who would benefit from challenging these fees. Mr. Jacks, in charge of the District's chapter 9 litigation committee, has advanced this po-

sition, undoubtedly hoping for a windfall as the developer who would otherwise have to pay the fees. However, the Court will not allow the developer's self-serving desires to dictate future insolvency analysis. The District Enterprise has the ability to impose and collect sufficient fees to cover the Lease payments now and in the future.

In providing overall evidence of future insolvency, the District has provided its original 2014 Budget, its Amended 2014 Budget, and its projections. Beginning first with the original budget, filed with the Colorado Division of Local Government in January 2014, it shows sufficient revenues for the year to meet *all* of the District's expenses. In accordance with Colo.Rev.Stat. § 29–1–103(1)(a) and (b), the District's budget lists "[a]ll proposed expenditures for administration, operations, maintenance, debt service, and capital projects" to be undertaken during the year, as well as all "anticipated revenues for the budget year." Colo.Rev.Stat. § 291–103(1)(a), (b). It discloses no new sources of revenue, but instead relies on the same taxes, the same fees, and the same contractual agreements that it had in 2012 and 2013. If the District were to collect the O & M Fees for this year, the District would be able to pay all of the bills that it has budgeted for 2014. To show insolvency, a debtor must prove—on a cash flow basis—"that it will be unable to pay its debts as they become due in the current year." *In re City of Bridgeport,* 129 B.R. 332, 338 (Bankr.D.Conn.1991).

Moreover, the original budget does not include additional revenues that the District has or will shortly realize in 2014. At its Special Meeting held on December 10, 2013, the District offered River Canyon a sweetheart deal: a reduced tap fee in the amount of $8,000 each (as opposed to the previous $30,000 purchase price per tap or the $70,000 market value cost per tap tes-

tified to by River Canyon's appraiser) for 25 lots. This deal resulted in an additional $200,000 to fund operations that is *not* reflected in its original budget. It also does not reflect the anticipated payments from River Canyon that its plan requires, projected to be approximately $114,000 on account of the allowed Class 2 payments and $373,538 on account of the allowed Class 5 payments.[6] Without these additional sources of revenues, the budget shows $206,650 in operating surplus. Adding these additional revenues will cause the District to realize an operating surplus of approximately $894,188 in 2014.

Admittedly, the District has not yet *collected* all amounts that are due and owing to it. Specifically, the District is owed $271,500 in delinquent O & M Fees that were assessed and due as of January 15, 2014. Ninety percent of these fees are owed by River Canyon, Mr. Jacks, his wife, and current members of the District's board. Nor has the District assessed the second half of the O & M Fees. There was no evidence that any of the District's property owners, with a median home price of $1.2 million, were unable to pay these fees. Thus, the District has a *collection* problem, as opposed to an insolvency problem. And yet it has a variety of legal remedies by which it can collect these fees from delinquent property owners. It can certify these amounts to Douglas County, assess liens and foreclose, or sue to recover what is owed.

The Amended 2014 Budget and the District's projections assume proposed plan changes rather than current sources of revenues. These documents do not show any collection of FA Fees and show a drastically reduced amount for O & M Fees. It presumes it will have unlimited

access to tax revenues, but anticipates very low assessment values for future years and, therefore, a very low tax base. These documents also reflect a $400,000 expense this year for bankruptcy-related legal fees. Even with these changes, the Amended Budget reflects a positive ending balance. The projections for 2014, on the other hand, reflect a deficit of $3,163,081. The difference is the addition of payments due on the Bonds in the projections. But as previously stated, the Bonds are only required to be paid from available tax revenues.

It was incumbent on the District to demonstrate future insolvency based on the same financial course it is presently operating under in order to show its need for bankruptcy relief. In other words, it was appropriate to show anticipated changes in maintenance costs and other expenses, but it needed to show how its current restricted and unrestricted sources of revenues would be insufficient to meet those expenses. It failed to present this evidence.

Moreover, the District needed to show in its projections only the amount of Bond payments that would be required under the fund-availability contingency provisions of the Bonds. The District, however, contends that reflecting only partial payments will only deepen its future insolvency because the unpaid portion of interest will compound forever and the District will never be able to dig itself out of the compounding interest hole. The District is not recognizing that there are legal and contractual limits placed on the maximum amount of interest that may be charged.

The District's authority to collect interest on the bonds is controlled by statute. Under Colo.Rev.Stat. § 32–1–1101(1)(c),

---

**6.** These figures are taken directly from the District's projections attached as Exhibit A to the Plan.

special districts are given the power to issue bonds, but the "maximum net effective interest rate" on those bonds cannot exceed the rate specifically authorized in the bond documents. The "maximum net effective interest rate" is defined by the statute as "the net interest cost of securities issued by a public body divided by the sum of the products derived by multiplying the principal amount of the securities maturing on each maturity date by the number of years from their date to their respective maturities." Colo.Rev.Stat. § 321–103(12). In this case, the Bond Resolution provided that the maximum net effective interest rate for the Bonds is 18.0%. No party offered a calculation of the Bonds' maximum net effective interest rate. Presumably, if the District fails to make interest payments on the Bonds, the compounding interest will at some point exceed this 18% net effective rate. At that point, the District would only be obligated to pay the 18% rate. *See generally* Eugene McQuillin, *The Law of Municipal Corporations* § 43:139 ("If the interest exceeds the legal rate, the bonds are … valid to the extent of the principal and the legal rate of interest").

Finally, development within the District is on an upward trajectory. Lots are being sold, homes are being built, and River Canyon has reached agreements with two different homebuilders to offer new home products within the District to underserved home buyers in the region. Although the District's current assessed value is too low to provide any significant tax revenues for operational and maintenance expenses (without CBS' consent), the assessed value needs to only reach its pre-recession level of $17,000,000 to provide sufficient revenues to cover the Bonds' debt service payments in full. Once it is in a stronger financial position, the District should be able to refinance the Bonds at a much lower interest rate. If that occurs,

the current compounding of interest "issue" will disappear. In the meantime, CBS has expressed its willingness to "flex" interest rates on the bonds for the next few years to accommodate the District's cash needs. Accordingly, the "compounding of interest upon interest" is only a short-term problem, and the deferral of payments of interest for two to three years is a viable option for the District and an alternative to bankruptcy.

In summary, the fund-availability contingency provision of the Bonds protects the District from future insolvency based on Bond debt. The FA Fees will cover the Lease payments until tax revenues increase based on higher assessments. This leaves only the operational needs of the District to consider. CBS understands that the District must have funds available to pay for basic operating costs and maintenance of the infrastructure. If assessed, the O & M Fees would be sufficient to cover most of these expenses in the next few years. The extraordinary expense of upgrading the water treatment facility, at an estimated cost of $1,500,000, is not required until 125 homes have been built. This is not likely to occur for several years. The District's projections do not anticipate this cost until 2018. To the extent that fees are insufficient to fund necessary expenditures, CBS has demonstrated its willingness to advance funds or allow unrestricted use of tax revenues.

## C. Negotiations and Other Alternatives to Bankruptcy

Under § 109(c)(5), the municipality must demonstrate one of four possible alternatives. The first option is to demonstrate that the debtor has already obtained the agreement of creditors holding at least a majority in amount of the claims in each proposed impaired class. No one disputes that the District has been unable to secure

this agreement. The next two options center on the debtor's attempts at negotiation. Either the debtor must demonstrate good faith negotiations or that for some reason it is impracticable to attempt negotiations. 11 U.S.C. § 109(c)(5)(B), (C). While the parties have negotiated prior to the filing of the petition, they dispute whether the District has negotiated in good faith. Finally, the statute allows a debtor to satisfy the fifth element if it can show its reasonable belief that a creditor may attempt to obtain a preferential transfer. 11 U.S.C. § 109(c)(5)(D). Additionally, in order to be authorized to file a petition under Colorado law and thus be eligible under § 109(c)(2), the District must "show to the United States bankruptcy court in and for the district of Colorado that it has been unsuccessful with other existing alternatives to bankruptcy." Colo.Rev.Stat. § 32–1–1402(2).

In terms of negotiations, the District has emphasized from the outset that bankruptcy was its only option, unless CBS agreed to a complete restructuring of the Bonds and to treatment of its claim as wholly unsecured. At the same time, the District has insisted on the elimination of all fees. It has proposed to take on additional services, currently provided by the homeowner's association, at no cost to the homeowners. It refuses to renegotiate its water service contract with River Canyon, even though River Canyon accounts for over two thirds of its current water usage and it is selling water to River Canyon at a loss. This is not evidence of good faith negotiations.

All parties recognize that continued development within the District during the next three to five years is crucial. As lots are sold and homes are constructed, the assessed valuation of property within the District will steadily increase, with a corresponding increase in tax revenues. As previously mentioned, the District need only reach its pre-recession valuation of $17,000,000 (which was assessed on fewer homes than are currently within the District now) before its 63 mill levy will be sufficient to fully cover its debt service, with funds left over for operational and maintenance expenses. Typically, the developer funds a new district's operating cash needs during the build-out period. In this case, the developer is doing the opposite. It is insisting on the elimination of all existing sources of fee revenue, for its benefit, and thereby manufacturing a "crisis."

On the other hand, CBS has offered the following alternatives to bankruptcy to help the District fund its core operations:

- Deferring interest payments on the General Obligation bonds.
- Deferring interest payments on the B-coupon bonds.
- Flexing interest rates applicable to the bonds during the next three-five years.

Moreover, CBS has already evidenced its willingness to work with the District by entering into the two forbearance agreements in 2011 and 2012. Its proposal would provide the District with either immediate access to tax revenue or loans sufficient to meet its budgeted operations and maintenance obligations and to ensure the integrity of its water delivery system during the next critical years. The District's response to CBS' informal proposal was to file its chapter 9 petition two weeks later, without any further warning or response given to CBS.

In addition, it must be remembered that, while River Canyon was in bankruptcy, it was difficult for these parties to enter into meaningful negotiations due to the uncertainty as to what would happen in River Canyon's bankruptcy. Its plan was confirmed on July 31, 2013. After this point,

the District made very few efforts to negotiate. The District waited to submit any proposal to CBS and United until February 26, 2014, almost seven months later. During that seven month period, Mr. Jacks was threatening the District with litigation over fees, refusing to pay fees, and then pushing his sweetheart water tap deal through the board. After the District's February settlement proposal, the District and CBS met to discuss it on March 12, 2014. The next day, CBS' counsel sent the District a letter outlining concessions it was willing to make and promising to send a formal counter proposal soon. It followed up with an email on March 27, 2014, saying that scheduled Spring Break trips of several key players had delayed their response but that it would be forthcoming within the next week. The District did not wait for its proposal and instead filed its petition on April 2, 2014.

The District's refusal to consider CBS' offer and its adamant refusal to assess any fees against River Canyon and its homeowners casts severe doubt on the good faith of its negotiations. *In re Ellicott School Authority,* 150 B.R. 261, 266 (Bankr.D.Colo.1992) (entity did not negotiate in good faith when economic provisions of its proposed plan were "nonnegotiable"). The fact that the District's property owners and River Canyon's principals (who were also board members through December 2013) do not *want* to pay any fees to cover the costs of operations is not a sufficient justification for bankruptcy. The District and River Canyon want the benefit of an efficient water system (that transports water over 9 miles to the boundaries of the District and then treats it so that it is potable), but they do not want to pay any additional fees required to support that system while the development is being built out.

More importantly, however, CBS' offer represents a viable existing alternative to bankruptcy. The statute authorizing a Colorado taxing district to file for federal bankruptcy protections makes· clear that the authorization is conditioned upon a municipality seriously pursuing other existing alternatives to bankruptcy. Colo. Rev.Stat. § 32–1–1402(2). It is not an "insolvent taxing district" and does not have the authority to file a bankruptcy petition under Colorado law, unless it has "been unsuccessful with other existing alternatives to bankruptcy." 11 U.S.C. § 109(c)(2).

Under Colorado law, a municipal bankruptcy is a last resort. Federal and Colorado law require a district to look at all alternatives, no matter how distasteful or difficult, before filing bankruptcy. For example, a district must seriously consider its non-bankruptcy alternatives such as *cutting services or raising fees before* a bankruptcy petition is filed. *See In re City of Bridgeport,* 129 B.R. 332, 339 (Bankr.D.Conn.1991). As stated by one bankruptcy judge:

> Municipalities that wish to come into bankruptcy under Chapter 9 in my judgment must, *at a minimum,* demonstrate that before filing they either used their assessment or taxing powers to a reasonable extent, or in their pre-petition negotiations have committed to the use of those powers as part of a comprehensive and appropriate work out of their financial problems.

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 83 (Bankr.D.N.H.1994) (emphasis added). In this case, the District is doing the exact opposite: cutting fees, adding services, and stripping off all liens against its revenues.

Chapter 9 is not intended to be a windfall to the District's developer and property owners at the expense of the

District's creditors. *See In re Wolf Creek Valley Metro. Dist. No. IV,* 138 B.R. 610, 619 (D.Colo.1992) (recognizing that chapter 9 is not intended to provide a windfall to plan proponents and that such a 'plan' constitutes bad faith). Courts do not countenance such manipulation of the bankruptcy process. For example, one court concluded there was "insufficient credible proof" of insolvency when a city filed a chapter 9 petition before first implementing cost-cutting and revenue-enhancing activities. *In re Town of Westlake, Tex.,* 211 B.R. 860, 867 (Bankr.N.D.Tex. 1997).

In this case, the District could have (1) negotiated and/or accepted CBS' offer; (2) negotiated with River Canyon to raise the golf course's water rates to bring them more in line with market prices; (3) attempted to minimize its legal expenses; (4) refused to take over the homeowner association's obligations at no financial cost; (5) turned over the operations and maintenance of its streets to Douglas County; (6) raised the District's water and sewer rates; (7) monetized the District's currently unused 162 acre feet of water; and (8) collected the 2014 O & M Fees already assessed from River Canyon and assessed the second half of the 2014 O & M Fees. Good faith requires that the District seriously explore all existing alternatives to bankruptcy before it files. *See In re New York City Off–Track Betting Corp.,* 427 B.R. 256, 282 (Bankr.S.D.N.Y.2010). It did not do so in this case.

■ For these reasons, the Court concludes the District has failed to demonstrate either that negotiations were impracticable or that it negotiated in good faith, or that it fully explored other alternatives prior to filing to bankruptcy. This leaves only one possible alternative under § 109(c)(5), which is for the District to demonstrate its reasonable belief that a creditor might attempt to obtain a preferential transfer. *See* 11 U.S.C. § 109(c)(5)(D). The District argues it has satisfied § 109(c)(5)(D) because United sent it a letter demanding its share of the costs associated with well repairs. The letter was primarily focused on future costs for well repairs, but it also mentioned some existing invoice for pre-repair estimates. The District contends that this constitutes United's attempt to obtain a preferential payment. While the letter was admitted into evidence by stipulation of the parties, it did not contain the attachment referred to in the letter of the pre-existing invoice. Without this evidence, the Court has no idea what the amount of bill was, what its payment terms were, or any other pertinent information. In addition, this debt was owed to some repair company who may or may not have had mechanics lien rights against the District. If so, any payment of a secured debt may not have been preferential. In any event, the Court received too little information to give this argument any credence. More importantly, the Court cannot believe that Congress intended any demand for payment by a creditor, no matter how small, as a sufficient basis for establishing eligibility under § 109(c)(5)(D). Accordingly, the Court concludes that the District is ineligible for chapter 9 relief because has failed to prove one the alternatives under § 109(c)(5), and that it is authorized to file under state law, as required by § 109(c)(2).

### D. Bad Faith Filing under § 921

■ Finally, the Court must consider whether the filing of the petition in this case was made in good faith. Section 921(c) provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the

requirements of this title." 11 U.S.C. § 921(c). If a municipality establishes that it is eligible for chapter 9 relief, then a rebuttable presumption of good faith arises. *In re City of Stockton, Cal.*, 493 B.R. 772, 795 (Bankr.E.D.Ca.2013). In this case, the District has failed to satisfy the eligibility requirements, arguably making it unnecessary for the Court to consider its bad faith. However, the Court will address good faith as an alternative basis for its ruling.

■ "Good faith" is not defined in the Bankruptcy Code. The " 'legislative history of [§ ] 921(c) sheds no light on Congress' intent behind this requirement.' " *In re City of Detroit, Mich.*, 504 B.R. 191, 274 (Bankr.E.D.Mich.2013) (quoting *In re New York City Off–Track Betting Corp.*, 427 B.R. 256, 278–79 (Bankr.S.D.N.Y.2010)). "As in many other considerations of good faith in the context of bankruptcy, the test is a totality of the circumstances where the Court is given the power to weigh the numerous factors in light of the circumstances as a whole in determining whether good faith is lacking." *In re City of San Bernardino, Cal.*, 499 B.R. 776, 790 (Bankr.C.D.Ca.2013). Courts have employed a multi-factor test to aid in this analysis. These factors include: "(i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practical; (v) the extent that alternatives to chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems." *Id.* (citing *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr.W.D.Wash.2009)). Many of these factors overlap with the eligibility requirements and several focus on the debtor's economic viability.

■ Most of the reported decisions on good faith challenges under § 921(c) have arisen in the context of a city's chapter 9 filing (Detroit, Stockton, San Bernadino). In these cases, the cities could not pay pensions or continue to provide basic municipal services, threatening the health and well being of their citizens. Such is not the case here. The District is not a city and no citizens were at risk prior to the bankruptcy filing. There were no threatened foreclosures, lawsuits, or collection actions taken by any of its creditors. There was no actual or threatened shut-off of basic services or deliveries.

Instead the District had just weathered a long and deep recession, which had severely depressed real estate values in this development, undercutting the District's tax base. Through the years of this recession and through the year of River Canyon's bankruptcy, CBS worked with the District to free up the modest amount of tax funds it had been able to collect so that it could utilize a portion of these funds for operational costs, even though those funds had been pledged to CBS. It was only after the recession had lifted, after River Canyon had emerged from bankruptcy, and after the increase in lot sales at dramatically increased prices, that the District sought chapter 9 protection. Admittedly, it will take a period of time for the County assessor's valuations to catch up with new market prices, resulting in a much higher tax base, but this is only a temporary problem. In the meantime, CBS and United stand ready, willing, and able to support the District's basic operational needs, as they did during the recession.

So why has the District chosen to file a chapter 9 petition at this time? Its representatives have testified that it is facing a budgetary crisis of significant proportions.

But its actions speak louder than its words. The proposed plan of reorganization that has been filed seeks to accomplish four main goals: (i) render the Bonds unsecured and payable without interest, over the next twenty-five years; (ii) reject the Lease but somehow utilize the water pipeline and treatment facilities without paying for them; (iii) to eliminate all fees against the landowners; and (iv) allow the District to use tax revenues for operational costs before any distribution to CBS. It proposes increasing its costs by voluntarily taking on the services that have been provided by the homeowner's association, at no cost to the homeowners. Without including the homeowner association fees, but eliminating the O & M fees of the District and the FA Fees of the Enterprise, the developer who presently owns 70% of the lots will save over $800,000 each year. The District also proposes to continue providing water to the golf course, owned by the developer, under its water agreement with River Canyon, at a fixed cost that is well below the actual cost of water to the District under its Water Service Agreement. In other words, the District will be providing water to the golf course at a loss. River Canyon's golf course is outside the boundaries of the District and yet it uses two-thirds of the District's water supply.

Thus, this plan is intended to primarily benefit the homeowners and the developer, rather than the District and its creditors. No one disputes that pushing fees too high would make it difficult to sell lots and then, in the long run, the development as a whole might fail. The District, the developer, and the District's creditors all share one common goal: to make this development successful. But the elimination of all fees, at a time when the District professes it is strained financially to the breaking point, belies its stated purpose for this filing.

It is more than a little ironic that, during the River Canyon bankruptcy, the same principal convinced this Court that the future for lot sales in this development was extremely bright and promising. It included in its projections that it would pay in full the O & M and FA Fees. Its appraiser testified that the going rate for water taps was in excess of $70,000. And yet, the developer approached the District, when it was strapped for cash because the developer had not paid its fees, and secured its agreement to sell the developer water taps for only $8,000 each. On many occasions, the same principal has caused the District to make choices for his benefit to the detriment of the District and its creditors.

This principal is Mr. Glenn Jacks, the manager of River Canyon, a long time board member of the District who resigned in late 2013, and who is a landowner in the development. Mr. Jacks is also one of only two members of the chapter 9 litigation committee for the District, who is steering the District's actions in connection with this bankruptcy filing. Despite the fact that he is no longer an official member of the District's board, Mr. Jacks continues to exert influence over the District. He has also had his counsel prepare a draft complaint, seeking to declare the O & M Fees and the FA Fees "unconstitutional" for allegedly violating TABOR law. He has indicated that he would not pay them, despite the fact that he authorized these fees as a board member in the years 2011 through 2013. The Court cannot believe that Mr. Jacks would actually file suit over these fees, tying this project up in litigation, incurring substantial attorney fees, and scaring away potential luxury home purchasers while the market conditions are extremely favorable. It would be akin to cutting off his nose to spite his face. Instead Mr. Jacks wants the District to elim-

inate the fees for him. In River Canyon's bankruptcy, he realized the opportunity to shed over $30 million of debt. He now wants to realize a windfall by eliminating fees at the District's expense.

The Court incorporates its earlier rulings in this Order as to the District's pre-petition negotiations, and the fact that it did not sufficiently explore other alternatives. It incorporates its findings as to the future insolvency of the District. But more importantly, the Court agrees with CBS and United that the District, through Mr. Jack's influence, has manufactured a financial crisis by refusing to assess and collect fees. In another case in which the quasi-municipality made no effort to use its assessment powers to meet its obligations, the court found bad faith, stating that, "[i]f this case can pass muster as a good faith filing it is difficult to imagine any municipality that could not 'engineer its way into the bankruptcy courts' . . . ." *In re Sullivan Cnty. Regional Refuse Disposal Dist.*, 165 B.R. 60, 82 (Bankr.D.N.H. 1994).

To the extent that there may be a shortfall attributable to extraordinary maintenance costs, CBS has convinced this Court that it stands willing to advance funds and/or to allow tax revenues to be abused for legitimate expenses of the District. These problems are temporary in nature and, as this development is sold and built out, the tax revenues will be more than sufficient to pay the District's debts.

## III. CONCLUSION

For all of this reasons, the Court hereby DISMISSES the petition on the bases of ineligibility and a lack of good faith in filing the petition.